## AFFIDAVIT OF SPECIAL AGENT TIMOTHY R. KENNY

I, Special Agent Timothy R. Kenny, depose and state as follows:

## INTRODUCTION

1. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since 2014. For much of that time, I have been engaged in gang, firearm, and drug investigations. I am currently assigned to the FBI's Boston Office. Based on my training and experience as a special agent, I am familiar with federal firearms laws.

2. Based on my training and experience, I am aware that 18 U.S.C. § 231(a)(3) makes it a federal offense to commit or attempt to commit an act to obstruct, impede, and interfere with any law enforcement officer lawfully engaged in the performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce, or the movement of any article or commodity in commerce, or the conduct or performance of any federally protected function. I am also aware that 18 U.S.C. § 922(n) makes it a federal offense for an individual under indictment for a crime punishable by imprisonment for a term exceeding one year to receive a firearm or ammunition that had been shipped or transported in interstate or foreign commerce. I am further aware that 18 U.S.C. § 111 makes it a federal offense to forcibly assault, resist, oppose, impede, intimidate, or interfere with a federal officer while that officer is engaged in the performance of official duties, with higher

1

statutory maximum terms of imprisonment if, during such acts, the individual intended to commit another offense or used a deadly or dangerous weapon.

3. As set forth below, I have probable cause to believe, and I do in fact believe, that on or about June 1, 2020, while members of the Boston Police Department ("BPD"), at least one of whom was also acting as a deputized federal law enforcement officer, were attempting to perform their duties during the commission of a civil disorder that involved wide-scale looting of merchandise, John BOAMPONG ("BOAMPONG"), born in 1983, violated the statutes listed above in Boston, Massachusetts, when he discharged a firearm, thereby assaulting a deputized federal law enforcement officer and other BPD officers, and otherwise interfering with their law enforcement duties. BOAMPONG also possessed this firearm and ammunition while having been earlier charged with a state crime punishable by imprisonment for a term exceeding one year.

4. The information in this affidavit comes from my personal observations and review of records, my training and experience, and information obtained from other agents, law enforcement officers and witnesses. The dates and times in this affidavit are approximate. Because this affidavit is submitted for the limited purpose of establishing probable cause to believe that BOAMPONG committed the offenses described above, I have not included each and every fact known to me or other law enforcement officers involved in this investigation. Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested criminal complaint. Facts not set forth herein are not being relied upon in reaching my conclusion that there is probable cause to support the issuance of the requested complaint. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

<007>

statutory maximum terms of imprisonment if, during such acts, the individual intended to commit another offense or used a deadly or dangerous weapon.

3. As set forth below, I have probable cause to believe, and I do in fact believe, that on or about June 1, 2020, while members of the Boston Police Department ("BPD"), at least one of whom was also acting as a deputized federal law enforcement officer, were attempting to perform their duties during the commission of a civil disorder that involved wide-scale looting of merchandise, John BOAMPONG ("BOAMPONG"), born in 1983, violated the statutes listed above in Boston, Massachusetts, when he discharged a firearm, thereby assaulting a deputized federal law enforcement officer and other BPD officers, and otherwise interfering with their law enforcement duties. BOAMPONG also possessed this firearm and ammunition while having been earlier charged with a state crime punishable by imprisonment for a term exceeding one year.

4. The information in this affidavit comes from my personal observations and review of records, my training and experience, and information obtained from other agents, law enforcement officers and witnesses. The dates and times in this affidavit are approximate. Because this affidavit is submitted for the limited purpose of establishing probable cause to believe that BOAMPONG committed the offenses described above, I have not included each and every fact known to me or other law enforcement officers involved in this investigation. Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested criminal complaint. Facts not set forth herein are not being relied upon in reaching my conclusion that there is probable cause to support the issuance of the requested complaint. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

**PROBABLE CAUSE TO BELIEVE THAT
JOHN BOAMPONG COMMITTED THE FEDERAL OFFENSES LISTED ABOVE**

**I.     Law Enforcement Efforts During Boston Civil Disorder Between May 31, 2020 and June 1, 2020**

5.     On or about May 25, 2020, George Floyd died while in the custody of the Minneapolis Police Department. The nature and circumstances of Mr. Floyd's arrest, subsequent death, and the actions of the Minneapolis Police Department came under intense public scrutiny. Almost immediately following Mr. Floyd's death, violent protests erupted in Minneapolis and surrounding communities. Similar protests quickly spread throughout the United States, including in Boston, Massachusetts.

6.     Most notably, on the evening of May 31, 2020 and continuing through the morning of June 1, 2020, what began as a peaceful demonstration against racism and police brutality in Boston's Back Bay neighborhood, devolved into widespread acts of violence, vandalism, looting and destruction of police property, including the burning of at least one police vehicle on Tremont Street. Some protestors threw rocks, bricks and commercially-available explosives, like M-80s, at police officers. Based on news footage of the event and information obtained from local law enforcement, many protesters launched fireworks at police using mortar-style tubes or another similar device. Numerous police officers were injured. As a result, according to media reports, between on or about May 31, 2020 and June 1, 2020, at least 53 people were arrested in Boston and charged with various criminal offenses.

7.     At approximately 2:30 a.m. on June 1, 2020, members of BPD were instructed to patrol areas of downtown Boston in an effort to stop looting and property damage that was active and rampant.

8. At approximately 3:00 a.m. on June 1, 2020, BPD officers encountered several individuals and vehicles in the area of the Arlington Street and Boylston Street intersection in front of a store belonging to a company identified herein as International Merchant 1. There were multiple law enforcement broadcasts about this store being looted over the course of the evening.

9. I am aware from International Merchant 1's website, which I have reviewed, that International Merchant 1 is a company that sells high-end goods online and at retail stores in the United States, Europe, and elsewhere.

**II.    Law Enforcement Encounter with BOAMPONG Just Before the Shooting**

10. While BPD officers were patrolling the area of Arlington Street and Boylston street during the early morning hours of June 1, 2020, they encountered a 2006 gray Hyundai Elantra. I have learned that this car is registered to BOAMPONG of Dorchester, Massachusetts ("BOAMPONG's car").

11. During the course of the investigation, officers learned the identities of the car's driver, BOAMPONG, and the three other passengers. Based on the above facts and other facts and statements gathered during this investigation, I believe that BOAMPONG had been driving the car throughout the events recounted in this affidavit.

12. Upon seeing BOAMPONG's car enter the area being patrolled, BPD officers instructed BOAMPONG and his passengers to leave the area. In response, the occupants of BOAMPONG's car became verbally combative towards the officers and failed to leave the area as instructed.

13. When BOAMPONG finally moved the car, he placed the car in reverse, without regard for officers or a nearby vehicle. I have been advised that this caused the BPD officers

concern, as it appeared that BOAMPONG's car was going to strike officers standing immediately behind the car or strike another vehicle.  Concerned about public safety, the BPD officers tried to prevent BOAMPONG's car from causing any injuries and shouted "whoa" and "stop," or words to that effect, several times.  BOAMPONG did not heed the officers' instructions, instead continuing to drive the car in the direction of the officers and other vehicles.  This caused a BPD officer to strike BOAMPONG's car on its roof or the upper windshield, using a baton, in an effort to stop the car from striking officers and another vehicle.  BOAMPONG then drove away in the direction of Charles Street.

### III.   The Shooting

14.   Shortly thereafter, I was informed, BPD officers at the scene observed BOAMPONG's car return to the area.  It traveled on Arlington Street, crossed over Boylston Street, and then turned onto Providence Street.  BPD officers saw the brake lights activate on BOAMPONG's car after turning on Providence Street.  Immediately thereafter, officers in the area heard a rapid succession of gunshots coming from the area of Providence Street near the location of BOAMPONG's parked car.  Multiple officers took cover by bracing or ducking behind cars and others objects, believing that they were being shot at.

15.   During the subsequent investigation, I learned that eleven 9mm shell casings were recovered from the area of Providence Street and Arlington Street.  Analysis done at the BPD Firearms Analysis Unit subsequently confirmed that these shell casings had been fired from the firearm found in BOAMPONG's car.

16. Based on the locations of the shell casings and the ballistic damage, I believe that the shots were fired from the vicinity of BOAMPONG's parked car across Arlington Street towards the area where numerous officers had been standing.

17. Bullet fragments were later recovered from a building located behind where the BPD officers had been standing. The bullets had broken through the windows of at least two apartments above ground level. Fortunately, no civilians or officers were hit by any gunfire.

## IV. Federal Presence at the Shooting

18. At least one of the law enforcement officers at the scene during the shooting was BPD Detective Timothy Stanton, who also serves as a Task Force Officer ("TFO") for the FBI's Metro Boston Gang Task Force. The task force's primary responsibility is to identify and address gang violence in the Metro Boston area, using joint investigative efforts with local law enforcement agencies. The task force focuses on gang-related drug distribution and violence through the enforcement of federal drug, firearm and racketeering statutes. Stanton was sworn in as a federal TFO on or about December 11, 2019. As a result, I am aware that since 2019, TFO Stanton has served as a federal TFO in a full-time capacity, and has been authorized to make federal arrests for violations of federal criminal law. In his capacity as a federal TFO, TFO Stanton has conducted interviews, executed search warrants and made arrests. While TFO Stanton's firearm and computer were issued by BPD, the FBI provided him with a desk and an additional FBI-issued computer, along with a truck to use during his TFO duties. TFO Stanton is in regular communication with his TFO supervisor at the FBI, along with other federal law enforcement officers on the task force.

19. Leading up to the night of the rioting, TFO Stanton had been in communication

with other TFOs concerning the protests, including discussions about the FBI's concern for the potential for rioting, arson, attacks on government buildings and suspected ANTIFA activity associated with the protests.

20.     On the night of the shooting, a BPD command center was established, composed of leadership from BPD, the Massachusetts State Police and other local law enforcement departments.  TFO Stanton was working in both capacities that night/early evening, as both a BPD officer and a TFO.  As a member of the FBI's Metro Boston Gang Task Force, TFO Stanton was ordered to collect intelligence regarding suspected ANTIFA activity.  Among other tasks, BPD assigned TFO Stanton to one of its public order platoons.  As a result, TFO Stanton conducted roving patrols of Boston's Back Bay and downtown areas, where many retail stores were being looted throughout the night.  Although TFO Stanton wore his BPD uniform that evening, he conducted his patrols in his FBI-issued truck, having obtained FBI authorization to use the truck during his duties on the night of May 31 and morning of June 1.

21.     I have been advised that TFO Stanton responded to the Arlington Street and Boylston Street intersection in order to assist other responding officers and curtail the looting in that area.  Upon arriving at that scene, he saw BOAMPONG's car stop and then drive in reverse towards law enforcement officers and another vehicle.  He observed the BPD officer strike BOAMPONG's car with his baton to get the driver's attention, as described above.  He also observed BOAMPONG's car depart the area, return a short-time later, make an erratic turn in front of TFO Stanton's truck, and proceed down a side street.

22.     Less than 10 seconds later, TFO Stanton heard numerous gunshots and, reasonably fearing for his safety, he braced himself inside his FBI truck to take cover.  He then drove off in

7

an attempt to locate the suspect who had fired the gunshots.

23. TFO Stanton communicated with other TFOs about the incident and later spoke to his FBI supervisor in detail about the shooting.

### IV. The Car Stop and the Car's Contents

24. After BOAMPONG's car sped off, BPD officers pursued it and stopped it. When the officers removed the occupants from the car, BOAMPONG was in the driver's seat, with the others occupying the front passenger seat, the rear passenger-side seat, and the rear driver-side seat.

25. Before the officers removed the occupants from BOAMPONG's car, at least one officer saw one of the occupants (not BOAMPONG) remove or attempt to remove a glove, which I believe was made out of latex or a similar material, from his hand.

26. According to the reports of this incident, which I reviewed, after BPD officers removed the occupants from BOAMPONG's car, they saw a tan/green semi-automatic firearm in the "lock back" position, lying on the floor of the front passenger-side floor mat. The officers also found a black firearm holster hanging out from underneath the driver's seat. Based on my training and experience, I am aware that a semi-automatic firearm in the lock back position means that it is empty, most likely because all of its ammunition has been fired.



*Sig Sauer P230 9mm firearm, on the floor of the front passenger floor mat – June 1, 2020*

27. BPD officers also found, in the rear of the car, a black trash bag that appeared to contain a red bathing suit with a price tag still attached, two liquor bottles that appeared to be unopened, and a pair of glasses with a price tag from a nearby store still attached. At least one of the occupants of BOAMPONG's car later told law enforcement that these items had been received after having been stolen during the looting that evening/morning.

28. On or about June 3, 2020, BPD officers executed a Massachusetts state warrant to search BOAMPONG's car. During the execution of this search, several items of significance were discovered, including: the tan/green firearm identified above, which was a Sig Sauer P230

9

9mm (the same caliber as the shell casings found on the street); a magazine capable of holding 15 rounds of ammunition; one live round of 9mm ammunition; approximately 20 liquor bottles, most of which were unopened and had a green price label with the name of a liquor store that was also subject to looting on the night of the incident, and located several blocks away from the intersection of Arlington and Boylston Streets; three red bathing suits with anti-theft sensors (which I know are usually removed by store personnel after a legitimate purchase) still attached; and three pairs of sunglasses, one pair of eyeglasses, and one earring.

29. I am aware that some of this merchandise bore price tags that appeared to have come from a company, identified herein as International Merchant 2, which, according to its website, sells goods at retail stores in the United States and Canada. I am also aware that International Merchant 2 has a store located several blocks away from the intersection of Arlington and Boylston Streets, the area in which police first encountered BOAMPONG's car and its occupants. I have learned through the course of this investigation that this store was amongst those looted during the evening of May 31, 2020.

30. During the subsequent investigation, I have learned that the firearm described above was submitted to the BPD Latent Fingerprint Unit for examination. Trained and experienced criminalists in the unit conducted an analysis of the items and determined that there was an identifiable latent fingerprint recovered from the magazine of the firearm. A comparison of the latent print recovered from the magazine to a known fingerprint taken from BOAMPONG revealed that the latent fingerprint was identified as belonging to BOAMPONG.

### V. Probable Cause to Believe That BOAMPONG Was the Shooter

31. As mentioned above, when BOAMPONG's car was stopped, BOAMPONG was

sitting in the driver's seat, under which the holster was found. BOAMPONG was therefore arrested at the scene of the car stop.

32. BOAMPONG was provided his *Miranda* warnings several times during the course of the evening. After being advised of his *Miranda* warnings, BOAMPONG admitted to doing the shooting, and complained that he was upset that the law enforcement officers had broken his windshield. He went on to say that his passengers were not responsible, and that he had not been aiming for the officers or anybody else. Based on this, especially his repeated displeasure about his windshield, and all of the other facts recounted above, I believe that BOAMPONG's intent was to forcibly assault, resist, oppose, impede, intimidate, and interfere with the law enforcement officers at the scene because of or on account of their performance of their official duties, among whom were TFO Stanton.

33. After BOAMPONG and the other occupants of his car were transported to BPD stations, they were taken separately to interview rooms. After being advised that their interviews with officers would be video- and audio-recorded, BOAMPONG and the other car occupants were interviewed.

34. Two of the occupants of BOAMPONG's car were interviewed by BPD officers. After waiving her *Miranda* rights, one of the female occupants denied going into any stores or stealing any items, but admitted that she had received stolen property from people who were involved in looting, and had asked people to give her stolen goods.

35. Similarly, another female occupant of BOAMPONG's car, who was interviewed at the BPD police station after waiving her *Miranda* rights, described the original interaction with police in the area of Arlington Street and Boylston Street and said that the driver of the vehicle,

11

BOAMPONG (whom she referred to as "JOHN" throughout the interview), was upset following the interaction with police. She further stated that they looped around the block and the vehicle eventually went down a side street right across from International Merchant 1's store. As noted above, eleven shell casings were later located on Providence Street, which is a side street across from International Merchant 1's store.

36. She also told investigators that after parking on the side street, BOAMPONG and her husband (another occupant) exited the vehicle. BOAMPONG walked away from car, and then she heard a lot of loud noises. She further stated that when BOAMPONG returned to his car, he was frantic and told everyone to quickly get back in the car.

## VI. BOAMPONG's Status as a Prohibited Person Under 18 U.S.C. § 922(n)

37. To determine whether BOAMPONG had violated 18 U.S.C. § 922(n), which prohibits an individual from receiving a firearm or ammunition shipped or transported in interstate or foreign commerce if that person was under indictment for a crime punishable by imprisonment for a term exceeding one year, I analyzed BOAMPONG's criminal record. I learned that, during the events recounted above, BOAMPONG had active state charges against him, including assault and battery on a police officer, in violation of M.G.L. c. 265 s. 13D, with a maximum term of imprisonment of 2½ years in the house of corrections, and resisting arrest, in violation of M.G.L. c. 268 s. 32B, also with a maximum term of imprisonment of 2½ years in the house of corrections. From reviewing BOAMPONG's criminal history, arrest, and court records, I am aware that his case, *Commonwealth v. Boampong*, Docket # 1915CR001208, is pending in Brockton District Court. I know from my training and experience that these offenses constitute felonies because they meet the definition of "crime[s] punishable by imprisonment for a term exceeding one year"

as set forth at 18 U.S.C. § 921(a)(20).

38. Additionally, I learned that BOAMPONG was arraigned on these charges on March 26, 2019, and that at the time of the offense, the next scheduled court date was to be a motion to suppress scheduled for a hearing on June 4, 2020.

39. Consequently, I have probable cause to believe, and do in fact believe, that BOAMPONG violated 18 U.S.C. § 922(n), which makes it "unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

## VII. Firearm and Ammunition in Interstate Commerce

40. The firearm recovered from BOAMPONG's car was a tan/green Sig Sauer P230 9mm handgun, serial # 58H007166, with a magazine capable of holding 15 rounds of ammunition, and one live round of 9mm ammunition. After this firearm and the ammunition were processed and placed into evidence, the handgun was thereafter sent to BPD Ballistics Unit, where it was successfully test fired and certified as a firearm. The one 9mm round was certified to be ammunition.

41. Based on my training and experience in firearms, consultation with ATF agents, and acquisition of records, I believe that the firearm identified above was manufactured outside of the Commonwealth of Massachusetts, and thus necessarily travelled in interstate commerce to be possessed by BOAMPONG in Massachusetts. Additionally, ATF agents informed me that no commercially available ammunition is manufactured within Massachusetts. As such, any ammunition possessed by BOAMPONG would have traveled through interstate commerce to be

13

possessed by BOAMPONG in Massachusetts.

## CONCLUSION

42.     Based on the above, I have probable cause to believe, and I do in fact believe, that on or about June 1, 2020, John BOAMPONG violated 18 U.S.C. § 231(a)(3) by committing and attempting to commit an act to obstruct, impede, and interfere with one or more law enforcement officers lawfully engaged in the lawful performance of their official duties incident to and during the commission of a civil disorder which obstructed, delayed, and adversely affected commerce and the movement of any article or commodity in commerce, and the conduct or performance of any federally protected function; violated 18 U.S.C. § 922(n) by having earlier been charged with a crime punishable by imprisonment for a term exceeding one year and having received a firearm and ammunition that had been shipped or transported in interstate or foreign commerce; and violated 18 U.S.C. § 111 by forcibly assaulting, resisting, opposing, impeding, intimidating, and interfering with a federal officer while that officer was engaged in, and on account of, the performance of his official duties, and doing so with the intent to commit another penalty and through the use of a deadly and dangerous weapon.

43.     I respectfully request that the Court issue a criminal complaint charging BOAMPONG with these crimes.

/s/ Timothy R. Kenny

Timothy R. Kenny
Special Agent, Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone this 30th day of July 2020.

HON. M. PAGE KELLEY
CHIEF UNITED STATES MAGISTRATE JUDGE