UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO.: 20-CR-10321-WGY |
| | ) | |
| v. | ) | ***LEAVE TO FILE REDACTED*** |
| | ) | ***MEMORANDUM AND TO EXHIBIT*** |
| JOHN BOAMPONG | ) | ***FILE EXHIBIT UNDER SEAL*** |
| | ) | ***GRANTED ON 10/25/21*** |

## DEFENDANT'S SENTENCING MEMORANDUM

At his core, and in his heart, John Boampong is first and foremost a family man – a deeply loyal and caring son and brother, and an "engaged and doting father to his [12-year-old son], █████" who just started the seventh grade. PSR ¶ 61; ████████████████████████ John's success in being a "very, very hands-on type of father" is remarkable and commendable, given his own father's abandonment of the family when John was just a toddler. *Id.* at 6 and 16; PSR ¶¶ 54-55. Raised by a single mother with two sisters, John learned early on the importance of familial responsibility, and the painful impact of a father's absence on his children: "I didn't want to be like him [his own father]. I wanted to be there emotionally and physically, how a man's supposed to take care of his responsibilities." Ex. 1 at 6. ██████ – and John's desire to be a good example to him – looms large over every decision John makes, including his acceptance of responsibility in this case. When asked by this Honorable Court why he pleaded guilty in this case, John Boampong said, in his own words:

> I want to be accountable for my actions, as I have a 12-year-old that I see all the time and he needs to be accountable for his actions, and I have to follow my own advice so that when me and my son finally have a face-to-face as to why I was in jail, I can honestly tell him so he [doesn't] make the same mistakes I did that led to me being incarcerated.[1]

---

[1] D.E. # 24, Transcript of Rule 11 Hearing, February 4, 2021, at pages 23-24.

██████ also loomed large in John's first significant encounter with police, just over 10 years prior to the events of this case, when John – mistakenly identified by police as the suspect of a crime – was assaulted, pepper sprayed, and arrested by officers in front of his infant son, who was also hit with pepper spray. PSR ¶ 62. That "whole experience had a significant impact on [John]'s physical and mental health," *id.*, and resulted in his significant apprehension of police.

Even though June 1, 2020 did not mark his first interaction with police, John's conduct that night – inexcusable and dangerous as it was – represented the culmination of years of deep frustration and pain. And – again, though neither justification nor excuse – the events of June 1, 2020 were preceded by a significant personal tragedy in John's life, and an interruption of critical and supportive therapeutic services and treatment. Compounding this, the John Boampong who fired a gun was, like so many Americans, in a state of crippling personal instability during both a global pandemic and a national crisis of police killings of African Americans.

John knows and deeply understands now that he could have seriously injured or killed someone that night by firing a gun in the air. He understands that his actions in the aftermath of an anti-police brutality protest were not just dangerous but were counterproductive to the movement of peace and non-violence embodied by Black Lives Matter. And he knows that his reaction was neither proportional to the police encounter he had that night, nor acceptable under any circumstances. John's actions on June 1, 2020, however, were absolutely out of character for him; the thoughtful letters of support ██████████ interviews with those people who know John best demonstrate just how much of an anomaly this offense was. Ex. 1, 13, 15, 16, 19. He stands before this Honorable Court prepared to be sentenced for his crimes and hopes for the opportunity to prove himself a worthy recipient of this Court's mercy.

For the reasons that follow, a below-guideline sentence of 42-months followed by three years of supervised release, is "sufficient, but not greater than necessary" to satisfy the statutory

aims of sentencing under 18 U.S.C. § 3553(a). John asks that this Court impose as special conditions of supervised release that he engage in psychotherapy and take medications, and that he engage in substance use counseling to address his alcohol use disorder. These conditions are consistent with the recommendations laid out in the Presentence Report ████████████

████████████████████████████████████████████████████████████████████

PSR, pg. 27; Ex. 1 at 19.[2] This proposed disposition considers the nature and seriousness of the offenses to which John has admitted guilt, as well as John's personal history, and the nature of his pretrial detention during the COVID-19 pandemic. The information that follows is offered to help shape a just sentence.

## BACKGROUND AND HISTORY OF JOHN BOAMPONG

*Early Life: Family and Education*

By all accounts, John gets his "arms wide open" personality from his mother, who was as generous as she was caring. Ex. 1 at 3; Exhibit 5, Letter of Sarah Cohan. With very few means and despite periods in family shelters, his mother, Patricia Boampong, raised John and his two sisters, Nakia and Jinnieva, in a deeply loving and supportive environment. PSR ¶ 54. When John was still quite young, his father told the family he was going out to run an errand, and he never returned home. Ex. 1 at 2. John did not find, or speak to, his father again for the next 25 years, meeting him at age 28 through family who had tracked him down. *Id.*; PSR ¶ 54.

Although his father's absence and abandonment deeply affected him, he grew incredibly close to his godparents, Edward Gathers and Sheila Warren, and their son, Jamal. *Id* at ¶¶ 54, 59; Ex. 1 at 2. Edward Gathers "was and is a warm, engaged, and loving presence" in John's life, and

████████████████████████████████████████████████████████████████████

John recalls: "He taught me how to fish, had us reading…he spent time with us, we'd go camping with him. He took us to baseball games. He was a wonderful influential person …a really great male figure in my life." *Id.* His godbrother, Jamal, describes what it was like to grow up in Roxbury "during the height of the crack epidemic," and how they withstood the pressure to join gangs and get involved with the wrong crowd: "That didn't matter to us. We had each other and support from our Dad [Mr. Gathers] and that's all we needed. We kept each other safe, we commisorated [sic] about how life was, we dreamed of how it should be and promised better for our future children." Exhibit 2, Letter of Jamal Gathers.

Despite the support of his mom and extended family, John's school experiences were difficult. Because of his family's difficult financial circumstances, he moved a lot as a child, which resulted in him attending five different elementary schools, two different middle schools, and two different high schools. Ex. 1 at 3. He was a heavier child and was relentlessly bullied for his weight throughout middle school and early high school. *Id.* He "grew a hatred for bullies," and described always wanting to defend himself or anyone else who was a victim of bullying. *Id.*

Mid-way through high school, John moved to western Massachusetts and ultimately graduated from Holyoke High School. PSR ¶ 82. While in high school, John played football, ran track, acted in a school play, stage managed the drama club, and formed a Black history committee, which brought prominent Black public figures to speak to classes. Ex. 1 at 4; PSR ¶ 54. His godbrother describes this period of John's life as one in which he "developed his own identity and was probably most 'true' to himself." Ex. 2. His work in the theater department – from "the front of the house to the back of the house, acting, and all things in between" – was incredibly formative for John, and it was especially profound and motivating for his godbrother:

> It was the first time I learned that you could be more than your neighborhood. That is when I realized I did not need to fit some sort of mold that society and my neighborhood expected of me. We could be and become whomever we wanted to.

4

If my bro could shed the hood and reinvent himself, so could I!

*Id.*

While still in high school, John began a lengthy stretch of gainful employment, which helped contribute to his self-esteem and focused him on productive activities. Before he moved to western Massachusetts, John worked at a nursing home, serving meals to residents and assisting in cleaning duties. Ex. 1 at 4. After graduating from Holyoke High, he worked full-time for five years at the Yankee Pedlar Inn, a banquet and event venue where he worked his way up from server to banquet captain. *Id.* In the years that followed, John was employed for significant and continuous periods, mostly in the service and retail industry. *Id.* at 4-5; PSR ¶ 91.

### *Partnership and Fatherhood*

While working at Macy's in 2007, John met Jan Ellis Wallace, who would become his partner of 12 years and ████████ mother. *Id.* at ¶ 60. Characterizing John as "loving and caring," Jan describes John's attentiveness and devotion to both her and their son – from attending every prenatal appointment, to changing ████████ first diaper, to being the only one who could calm Jan and ████████ anxieties about issues big and small. Exhibit 4, Letter of Jan Ellis Wallace. Through thick and thin, John and Jan supported each other and their young son; Jan expressed that the couple at their core "are amazing friends and … co-parent amazingly." *Id.*.[3] In their early years together, Jan enrolled in nursing school and John was a stay-at-home dad to ████████ *Id.* at ¶¶ 87, 89, Ex. 1 at 6. Though John later went on to work at Boston Sports Club as a Welcome Team Member – a position in which he took immense pride – he went through bouts of unemployment,

---

[3] The PSR describes two prior temporary restraining orders (lasting for one day in 2009 and 14 days in 2019, respectively; the latter was sought by Jan after the couple's breakup). *See* PSR ¶ 66-67. The descriptions in the PSR of violent and seemingly out-of-control behavior are out of character for John and reflect instead someone who was clearly devolving in a state of mental health crisis, as discussed below at pages 11-14. Indeed, Jan described John's normal state ████████ as being very loving and caring. She expressed her disbelief at his conduct in this case, saying, "That's not him," and describing having "seen [John] upset and he [wouldn't] lose his head to do something that reckless." Ex. 1 at 15.

often precipitated by significant life events described below.

As a father to ███████ John was deeply engaged and determined to be both physically present and emotionally involved in his son's upbringing. Ex. 1 at 3, 6; Ex. 2. Having grown up without a father, John modeled his parenting on the devotion and care shown to him by his godfather; he explains: "I wanted to be someone who took a special interest in my children. I wanted to be like [Edward Gathers]." *Id.* at 6. To that end, John joined a "Dad's reading program" at a school library and brought ███████ and his cousin, for whom John acted as a surrogate father, to weekly meetings where fathers and children read together and shared their thoughts on different books. *Id.* at 5. He engaged in weekly group meetings for young fathers at Father's Uplift, where he also worked with a parenting coach to learn how to cope with the stressors of fatherhood.[4] PSR ¶ 76; Ex. 1 at 9. He strove to teach his son right from wrong, and to teach him the skills to build a productive life. Using a Pringles can as a piggy bank, John taught ███████ the importance of savings and budgeting – even as his young family struggled to make ends meet. *Id.* at 5.

John's approach to fatherhood and his care and concern for others are entirely consistent with who John is as a person. ███████ characterizes John as "a serious man with a clear moral compass, who embraces altruistic values and places a premium on being helpful to others." *Id.* at 19. From his work as a personal shopper for Instacart, where he "felt like [he] was doing something positive – helping people," to taking in a friend or family member who had fallen on hard times, John deployed his "arms-wide open" approach to family, friends, and work. *Id.* at 5; Ex. 4.

At times, however, John's help and care of others has affected his ability to focus on his own needs, and impacted his relationship with Jan. Describing John's character, his godbrother, Jamal, writes that John "is genuine when he asks how you are doing. He is careful with other people's feelings. He wants to help everyone except himself." Ex. 2. Jan believes that John's

---

[4] *See* Father's Uplift, Inc., at https://www.fathersuplift.org/

biggest vulnerability is that he can be easily taken advantage of because "he cares too much for people," and "he doesn't pay attention to peoples' ulterior motives." Ex. 1 at 15. John acknowledged that he and Jan argued when he tried to help others when they themselves were not financially stable, but, echoing his mother's adage of, "we feed family," John explains, "It's in my DNA to try to help people." *Id.* at 6.

*Racial Trauma: Encounters with Police, Exposure to Violence, & Psychological Response*

Rather than viewing John's actions in this case in a vacuum, and punishing him for his dangerous and absolutely reckless act in isolation, he asks this Honorable Court to understand that his actions were informed and influenced by his own lived experiences, and by what he repeatedly witnessed happen to Black men throughout his life and throughout our country. Because of his personal history and psychological response to these negative encounters, described below, he has understandably approached interactions with police with a sense of apprehension and fear.

When John was 14 years old, a stranger stabbed him in the arm with a broken bottle. PSR ¶ 69. When he was 16 and working at the nursing home in South Boston, he was physically jumped by a group of white youths in a racially motivated attack. Ex. 1 at 6. Hit in the head and arm with a tire iron, John suffered a head injury that required staples, and arm paralysis that lasted for several months after the attack. *Id.* at 6, 10; PSR ¶ 69. His sister, Jennieva, recalls that police responded, took a report, and "did nothing." Ex. 1 at 15. John remembers that the responding police officers asked him – the victim of a brutal attack – why he was in the area and what he was doing there. *Id.* at 10. John felt incredibly disempowered and disheartened by the officers' response and felt that he was left unprotected from possible future attacks. *Id.* This assault "precipitated significant symptoms of trauma as well – avoidance, fear, vigilance, sensitivity to noise." *Id.* at 18. For some time afterwards, John was scared to go outside by himself, and the attack was a main motivating factor in deciding to move to western Massachusetts. *Id.* at 10.

7

In 2010, when ███████ was still just a baby and John and his young family were at a motel in Braintree with their dog, Braintree police responded to a report at the motel of a large, Hispanic male abusing a dog. *Id.*; PSR ¶ 77. John, being a Black man, was obviously not Hispanic, nor did he abuse his dog – but in the course of the officers' stop and arrest of John and after his protesting that they were mistaken in identifying him as a perpetrator, the officers hit him with batons, kicked him in the back and head, and deployed pepper spray, hitting infant ██████. *Id.* John was hospitalized at the Boston Medical Center for 18 days as a result of this encounter, and he suffered burst blood vessels, head and back contusions, headaches, back pain, and soft tissue swelling related to blunt trauma, and he was evaluated for possible corneal damage. *Id.* ████████ was removed from his parents' care for several weeks, while an investigation was pending, and his separation from his son was absolutely intolerable for John. *Id.* at ¶ 76. John was charged with several crimes in Quincy District Court related to this encounter and was ultimately found Not Guilty of all of the police-involved offenses – including two counts of Assault and Battery on a Police Officer and Resisting Arrest. *Id.* at ¶ 44.[5]

In the aftermath of this incident, John was diagnosed with, and was receiving treatment for, Major Depressive Disorder, Post-Traumatic Stress Disorder ("PTSD"), and Panic Disorder. *Id.* at ¶ 73, 75, 78a; Ex. 1 at 18. ███████████████████████████



██ Jan, who was present during the incident and holding ██████ when he was pepper sprayed

---

[5] An Animal Cruelty charge was dismissed prior to trial, and John was convicted at trial only of the minor misdemeanor offense of Disorderly Conduct. *See* PSR ¶ 44.

and John was beaten in front of them, corroborated these symptoms, and noted that John suffered nightmares related to the encounter, and was "always on edge." *Id.* at 16. ██████████ ██████████████████████████████████████████████████ his godfather, Edward Gathers, put it succinctly: John was absolutely traumatized by this encounter. *Id.* at 13.

In the years that followed, this experience affected John's ability to work and maintain stability for his family – not just because he suffered significant psychological aftershocks, but also because he had difficulty finding and maintaining work while the Quincy criminal case was pending. *Id.* at 10. ████████████████████████████

██ He blamed himself for his family's witnessing the violent attack in Braintree, ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████

He ultimately was able to receive housing subsidies related to these experiences and psychological diagnoses. PSR ¶ 89. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ Jan describes John's committed engagement in therapy and treatment: "He took it really serious … He didn't miss appointments," and explained that he was doing "what he needed to do to re-center." *Id.* at 16. With treatment, medication, and counseling, John's trauma reactions and PTSD symptoms began to subside. *Id.* at 15. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ his godbrother, Jamal, echoed these observations, noting that "when angry, [John] might raise his voice or storm off, but also has learned good strategies to de-escalate himself and calm down." *Id.* at 14.

Despite the mitigation of his symptoms, John was continuously and relentlessly exposed to race-driven encounters, police violence, and police misconduct within his community and family. In the City of Boston between 2007 and 2010, for example, Black people – despite only being 24% of the city's population – were subject to 63% of all police interrogations, stops, frisks, or searches.[6] During this same period, Boston police initiated more street encounters in neighborhoods that had more Black residents.[7] Young Black Bostonians have reported feeling scared of being targeted by police while walking home or to school.[8] These fears are not unfounded – nationwide, despite making up less than 13 percent of the U.S. population, Black Americans are killed by police at more than twice the rate of white Americans.[9] The violence perpetrated against Black people is more than just a statistical possibility for John. In addition to his own experiences, his godbrother has also been stopped by police for "fitting the description" for a crime and was choked until he passed out. Ex. 2.

It is well recognized that fear of, exposure to, and experience with police violence fundamentally shape the psychological well-being of Black men – and these issues have significantly affected John throughout his life. Police encounters, especially those that involve physical contact (even of a frisk) or force and those that do not result in arrest, summons, or seizure of contraband are associated with worse mental health symptoms and outcomes for Black men.[10]

---

[6] ACLU RACIAL JUSTICE PROGRAM, BLACK BROWN AND TARGETED: A REPORT ON BOSTON POLCE DEPARTMENT STREET ENCOUNTERS FROM 2007-2010, 4 (2014), https://www.aclum.org/sites/default/files/wp-content/uploads/2015/06/reports-black-brown-and-targeted.pdf.

[7] *Id.* at 7.

[8] *Id.* at 13.

[9] Julie Tate et al,. *914 People Have Been Shot and Killed by Police in The Past Year*, The Wash. Post, updated Oct. 21, 2021, https://www.washingtonpost.com/graphics/investigations/police-shootings-database/; *see also Mapping Police Violence Database*, updated Oct. 14, 2021, https://mappingpoliceviolence.org/ (noting Black people were 28% of those killed by police in 2020 despite being only 13% of the population).

[10] Amanda Geller et al., *Aggressive Policing and the Mental Health of Young Urban Men*, 104 AM. J. OF PUB. HEALTH 2321, 2321-27 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4232139/pdf/AJPH.2014.302046.pdf

Overall, "[r]acial disparities in policing suggest that direct and indirect exposures to police violence and police killings may function as both *traumatic and chronic stressors* in the lives of Black males and their families."[11] Importantly, neither violence nor racism has to be personally experienced in order to affect Black men's mental and overall health – unfortunately, the *perceived* threat of either violence or racism can have the same negative health effects.[12]

John wishes for this Honorable Court and his community to know that despite individual negative encounters he has had with police, and despite his conduct in this case, he is <u>not</u> anti-police. He was not motivated by animus towards police – but instead was consumed with fear. Specifically, the fear of a negative police encounter, and the fear of the injustice towards Black Americans that was illustrated in news headlines in the days and months leading up to the protests in Boston. Indeed, he has experienced several positive interactions with police officers, including working with them as Instacart clients. He also recalls a very positive encounter where "a Boston police officer asked if he could get ██████ a Christmas present." *Id.* at 11.

*2019-2020: "A Shell of His Former Self"*

Before 2019, although John experienced bouts of un- and underemployment, and struggled with both housing and food insecurity, he maintained for significant stability for his son and for his family. He was engaged in meaningful mental health treatment and largely compliant with a medication regimen that treated his PTSD, major depressive disorder, and anxiety. PSR ¶¶ 72-76. In the year before his arrest in this case, John worked two jobs that he absolutely loved and in which he felt valued – as an Instacart personal shopper, and a customer service manager at Boston

---

[11] Jocelyn Smith Lee and Michael Robinson, *"That's My Number One Fear in Life. It's the Police": Examining Young Black Men's Trauma and Loss Resulting From Police Violence and Police Killings*, 43 J. of Black Psycol. 143, 147 (2019), https://journals.sagepub.com/doi/pdf/10.1177/0095798419865152
[12] Raja Staggers-Hakim, *The Nation's Unprotected Children and the Ghost of Mike Brown, or the impact of national police killings on the health and social development of African American boys*, 26 J. of Hum. Behav. in the Soc. Env't., 390-99 (2016).

Sports Club where he was on a promotion track. Ex. 1 at 5, 11. He brought his mother, who was in declining health and had moved down South in recent years, to live in a nursing home in Boston, and he was "hopeful that her health would improve and she would soon be living independently." *Id.* at 11. ▮▮▮▮▮▮ was excelling in school, and John and Jan had plans to finally marry. *Id.*

In May 2019, however, John's world collapsed when his mother, Pat, died just hours after he visited her in her assisted living facility. PSR ¶ 56, Ex. 1 at 16. Pat's death "sent John into a spiral." Ex. 2. Jan, with whom John was still in a relationship at the time his mother died, "saw a man's heart break in a way only God can repair." Ex. 4. He expressed – and still feels – tremendous guilt over his mother's death, often asking, "'why did I leave?' as if the outcome would have been different if he stayed longer that day." Ex. 2; Ex. 1 at 3. John sank into a deep depression. *Id.* at 13, 16. Jan said that John began to significantly withdraw from her, from others, and from his life. *Id.* at 15. John and his godbrother did not speak for several months as John self-isolated. Ex. 2. According to Jamal, John's isolation from him was beyond unusual, and John suffered greatly in the aftermath of his mother's death: "We have never gone that long without speaking to one another, EVER! Even when we were fighting! … For the first time in my whole life I did not know how to reach him and I was scared by it. It seemed like he wanted to die." Ex. 2. John started drinking a great deal more to try to cope with this loss, and he ultimately broke up with Jan. Ex. 2; Ex. 1 at 6. According to Jamal, "[a]t this point, he was a shell of his former self." Ex. 2.[13]

What followed unfortunately was a perfect storm: COVID-19 was declared a global pandemic in March 2020 and upended life as we all knew it. For John, the impact was more acute – the COVID-related lockdowns shuttered the gym where he worked as a customer service

---

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

manager, and John was laid off. PSR ¶ 85, Ex. 1 at 12. Terrified of going into stores and contracting COVID given his underlying health condition,[14] John stopped working for Instacart. *Id.* Even worse, he was unable to continue therapy when in-person counseling was suspended due to COVID, and he had difficulty refilling prescriptions through Codman Square Health Center, where he had been a longtime patient. PSR ¶ 72; Ex. 1 at 12. When his medications ran out, "he was depressed, anxious, and irritable." *Id.* His cousins, with whom John was living at the time, described John's suffering after his mom's death as being significantly compounded with the loss of his job. *Id.* at 16. ██████████████████████████████████████

████████████████████████████████████████████ Without his mother who was his best friend, and without therapy, medication, and purpose, John was rudderless. ███████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████

█████████████████████████ John's own experiences, are consistent with the experiences of many Americans during the pandemic. In a June 2020 study by the Centers for Disease Control, adults in the U.S. experienced considerably elevated adverse mental health conditions associated with COVID-19 – nearly double the pre-pandemic rates of symptoms of anxiety or depression, substance use, and serious suicidal thoughts.[15] Black Americans like John were among the more vulnerable groups who reported experiencing disproportionately worse mental health outcomes, increased substance use, and elevated suicidal ideation."[16] The Massachusetts Association for

---

[14] *See* PSR at ¶ 70, reflecting a diagnosis of hypertension.

[15] Joshua Gordon, *One Year In: COVID-19 and Mental Health*, Nat'l Inst. of Mental Health (Apr. 9, 2021), https://www.nimh.nih.gov/about/director/messages/2021/one-year-in-covid-19-and-mental-health

[16] Mark Czeisler et al., *Mental Health, Substance Use, and Suicidal Ideation During the COVID-19 Pandemic*, 69 Ctr. for Disease Control and Prevention, Morbidity and Mortality Wkly. Rep. 1049-57 (Aug. 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6932a1-H.pdf

Mental Health documented this increase in clinically significant anxiety, depression, or both among Black Americans during the COVID-19 pandemic, and noted that Black Americans died from COVID-19 at a rate more than double that of white Americans.[17] Significantly, "this coincided with the recent racially motivated violence against black people, exacerbating centuries of race discrimination and increasing their traumatic stress."[18]

*May 2020: The Murder of George Floyd, and the Crack in the Dam for John*

In the months leading up to June 1, 2020, it was clear to those closest to him that John was "losing the battle with this mental health." Ex. 2. The losses he suffered – from the death of his mother, the breakup of his relationship with Jan, being laid off from a job he loved, the loss of therapeutic care and medications, and the isolation imposed by the pandemic – were deeply painful and personal, but they were also the unfortunate epitome of the relentless of Black grief in America.

> The only constant now is loss. More than 200,000 people are dead from COVID-19. We've all lost time, routines, jobs, connections to others. But the grief has not been evenly distributed. Grief in this country has always had an equity problem, and 2020 has only amplified the issue, as Black deaths have come in back-to-back blows, from the coronavirus, police brutality, and the natural deaths of those we look up to most. Each new death, each new example of an old injustice, renews our grief, sending little shock waves of sorrow. We are in the middle of a Black bereavement crisis ...[19]

The Black experience in America includes mourning not only personal losses, but also mourning for members of the Black community at large, creating a bereavement bubble in which the Black community grieves collectively.[20] The killings of Ahmaud Arbery, an unarmed Black man who

---

[17] Mass. Ass'n of Mental Health, Issue Advisory: Estimated COVID-19 Behavioral Outcomes 1, 2 (June 2020), https://www.mamh.org/assets/files/Final_COVID-19-Deaths-of-Despair_MAMH-062220.pdf. (describing an uptick from 36 to 42 percent as to Black Americans).
[18] *Id.*
[19] Marissa Evans, *The Relentlessness of Black Grief*, The Atlantic, September 27, 2020, https://www.theatlantic.com/ideas/archive/2020/09/relentlessness-black-grief/616511/
[20] *Id.*

was jogging on a country road when he was gunned down by white vigilantes, and Breonna Taylor, an unarmed Black woman asleep in her own bed when she was fatally shot by police, were notably painful among the losses that sent "shock waves of sorrow" throughout the Black community in early 2020.[21]

On May 25, 2020 – one week before the events of this case, and just days after the one-year anniversary of John's mother's death – George Floyd, a Black man, was killed in broad daylight by a Minneapolis police officer who kneeled on his neck for 9 minutes and 22 seconds until he was dead. George Floyd's killing was recorded by a teenage bystander, and the heartbreaking and disturbing video was broadcast to people's phones, social media, and living rooms. Although George Floyd was not the first Black man killed in an officer-involved encounter – nor, sadly, would he be the last – the impact of his death on the Black Americans for whom the recording of his death was replayed was enormous, and the broadcast of his killing propelled an anti-police-brutality movement the likes of which our country had not seen since in decades. Protests erupted in major cities in the aftermath of George Floyd's death to call for change and accountability in police-involved killings. ███████████████████

████████████████████████████████████████████████

████████ He thought, "This is something I can be a part of … I'm gonna go march, because I'm tired of seeing African American males and females being subjected to police brutality or misconduct." Ex. 1 at 12.

This Honorable Court need not condemn the officer who killed George Floyd – or condemn any officer in any police-involved shooting for that matter – in order to understand how and why John Boampong reached his lowest point on June 1, 2020. And as Your Honor aptly and recently

---

[21] Ahmaud Arbery was killed in Brunswick, Georgia on February 23, 2020, and Breonna Taylor was killed in Louisville, Kentucky just weeks later, on March 13, 2020.

put: "racism is a significant part of our national heritage [and] it demeans and degrades the very fiber of our nation. Like cancer, when it appears it metastasizes, spreading hate to recipients with all too predictable consequences."[22] Widespread, videoed police brutality has been described as the "most recent torment" in a lengthy history of racism and violence against Black Americans.[23]

Like many Black men, John Boampong saw himself in George Floyd. The callous disregard for human life exhibited by Officer Derek Chauvin as he kneeled on George Floyd's neck felt targeted and purposeful, and weighed heavily on John. He felt as though his worst fears of a police encounter had been confirmed before his very eyes. In conversations at the time with his godbrother, John "spoke of being powerless and felt like the world was crashing in around him." Ex. 2. Jamal said that after George Floyd's death, "it was easy to see that [John] was unhinged" and that he "sounded worn, defenseless and apathetic." *Id.*

Like John, many Black Americans reported a marked increase in depression and anxiety after the murder of George Floyd.[24] As a result of their awareness to the racial disparities in policing and the ingrained fears and impact of systemic racism, Black men may experience a heightened "sense of powerlessness to protect themselves from the threat of police violence" and these experiences "shape their coping responses to the traumatic stressors of witnessing or experiencing police violence and killings."[25] In a 2018 study, experts found that Black Americans

---

[22] *Boston Parent Coalition for Acad. Excellence Corp. v. School Cmte of City of Boston, et al.*, No. 21-cv-10330-WGY, Indicative Rule 60(b) Ruling, D.E. 141, fn 16 (Oct. 1, 2021).
[23] Greg Johnson, *Police Killings and Black Mental Health*, Penn Today, June 2020), https://penntoday.upenn.edu/news/police-killings-and-black-mental-health.
[24] Alyssa Fowers, *Depression and Anxiety Spiked Among Black Americans After George Floyd's Death*, The Wash. Post, June 12, 2020. *See also* Jacob Bor et al., *Police Killings and Their Spillover Effects on the Mental Health of Black Americans: A Population-based, Quasi-experimental Study*, 392 The Lancet 302, 308 (July 28, 2018), https://doi.org/10.1016/S0140-6736(18)31130-9. ("The observed adverse mental health spillover effects of police killings of unarmed black Americans could result from heightened perceptions of threat and vulnerability, lack of fairness, lower social status, lower beliefs about one's own worth, activation of prior traumas, and identification with the deceased.").
[25] Smith Lee, supra, note 11, supra at 148.

experience significantly higher levels of psychological distress than other groups in the aftermath of police shootings of unarmed Black men, resulting in a unique "mental health burden" suffered nearly solely and painfully by Black Americans.[26] This "mental health burden" is the vicarious trauma that Black Americans experience when seeing repeated acts of violence that are borne from implicit bias and systemic racism.[27]

John wanted to be part of a movement to support other Black Americans, and to condemn racism in all forms. But this call to action affected a John Boampong who himself was already grappling with years of experienced and perceived racism and violence, and who was rudderless in the perfect storm of losses that preceded this case.

*"Not My John": The Events of June 1, 2020*

The first reaction that Edward Gathers, John's godfather, had to learning about what John had done on June 1, 2020 was to say, "Not my John. They must have made a mistake." Ex. 1 at 13. To say that this disproportionate and gratuitous act of violence was out of character for John Boampong is again to echo the words of those closest to him – ██████████████████████████ ███████████████████████████

But John did commit a very serious crime when he fired a gun in the air in the aftermath of a police encounter – with police and civilians nearby, amid devolving protests and looting. Immediately after his arrest, he admitted what he had done – and he took sole responsibility for his actions. PSR ¶ 21. Indeed, John pled guilty to an Information in this case, having communicated his desire to accept responsibility to the government very early on in this case. He has also

---

[26] *See* Bor, supra, note 24, at 308.

[27] *Id.* at 302 (internal citations omitted) (noting that Black Americans experience the trauma of the killings of other unarmed Black Americans vicariously and experience "heightened perceptions of systemic racism and lack of fairness, loss of social status and self-regard, increased fear of victimisation and greater mortality expectations, increased vigilance, diminished trust in social institutions, reactions of anger, activation of prior traumas, and communal bereavement.").

expressed significant remorse, ███████████████████████████████████

███████████████████████

The government, at John's detention hearing, expressed its belief that John's conduct on June 1, 2020 represented a concerning escalation of anti-police behavior and aggression. But neither animus nor aggression motivated John's conduct that night. His encounter with police and his reaction in its aftermath was not planned. Having attended the peaceful protest that started at Nubian Square in Roxbury, John was on his way home when he received an urgent call from his cousin, asking to be picked up. *Id.* at 12. After picking up his cousin, his wife, and John's girlfriend, John drove through a scene of chaos: a heavy police presence covered downtown Boston and officers' interactions with civilians ranged from peaceful to violent.

Some people threw sticks, bottles, and garbage cans at police cruisers,[28] and some officers later became the subject of civil rights suits alleging police brutality against peaceful protestors.[29] Just blocks from where John was later arrested, at least one Boston Police officer, who was later suspended for unbecoming conduct, boasted about hitting protestors, "at one point saying 'I'm f----ing hittin' people with the car.'"[30] Of course, none of this excuses John's conduct, but it does illustrate the chaos of that night.

When John drove his car down Boylston Street, he was stopped by multiple police officers

---

[28] *See* Boston Police Dep't., Internal Affairs Recommendations and Report, (2021), https://d279m997dpfwgl.cloudfront.net/wp/2021/10/20211008174643534.pdf

[29] *See Huffman, et al., v. City of Boston, et al.,* No. 21-cv-10986-ADB, First Amended Complaint at D.E. 15 (D. Mass. Aug. 16, 2021) (alleging that Boston police officers struck three protestors with wooden riot batons and sprayed two protestors with pepper spray). Publicly available excerpts of police body camera footage depict some of the violent encounters between police and protestors that night. *See e.g.* https://www.youtube.com/watch?v=dMy5m99qT_o; https://www.youtube.com/watch?v=6actiPWCNd8.

[30] Deborah Becker, *Boston police suspend sergeant who bragged about hitting George Floyd demonstrators*, WBUR, Oct. 8, 2021, https://www.wbur.org/news/2021/10/08/boston-police-suspend-sergeant-who-bragged-about-hitting-george-floyd-demonstrators. Excerpts of this officer's bragging was recorded on body camera footage, and is available at: https://www.youtube.com/watch?v=sMYF-Y_r52Y. The resulting 10-day suspension for that officer was such because, despite his boasting and joking about committing serious bodily harm against protestors, he did not, in fact, hit anyone with his car.

and ordered to "move, move!" The occupants of John's car (not John) became verbally combative with officers, PSR ¶ 14, and as John went to back up, an officer smashed his windshield with a baton. Ex. 1 at 12-13. For John, this "echoed his traumatic experience in 2010, when he, his fiancée and their infant son were all pepper sprayed, and he was mis-identified as a criminal suspect." *Id.* at 19. "'Out of frustration with everything,' John drove around the block, pulled out a gun and fired it" toward the direction of Arlington and Boylston Streets, where BPD officers were standing. *Id.* at 13; PSR ¶ 16. Officers undoubtedly thought they were under attack, and this deeply regrettable and stupid act could have caused the very violence that John protested earlier that day.

John knows now he should have just driven away, gone home to be with his son, and never possessed or fired a gun. But he asks this Honorable Court to consider his actions on the night of June 1, 2020 in the context of the perfect storm of loss that came before, and the vulnerability of his particular psychological trauma response and history.

*The Impact of Pretrial Detention and Continued Incarceration*

The last nearly 17 months mark not just the longest period of imprisonment for John but is also the only time in his life in which he has ever been incarcerated. John struggles every day to cope with this and manage his stress. ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ A deeply religious man, John reads and concentrates on Bible verses and Psalms that relate to "asking the Lord for forgiveness" and that help him cope. *Id.* at 17. John's godbrother expressed fear that John "would be crushed under the weight of an incarceration," ██████████████████ "'I worry – how long can he keep going. He's a very loving, smart guy, and to be such a young age' while facing a long sentence. 'He should be getting help for his anger. He had counseling at Codman Square. *He was working on positive goals…. Incarceration would*

*extinguish that.*'" Ex. 1 at 14 (emphasis added).

Being imprisoned during the COVID-19 pandemic has also taken a significant toll on John and has resulted in deeper isolation and stagnation. Family visits were suspended for the better part of a year, and John has struggled to cope with being unable to see his son. ██████, too, is "bereft without his father." *Id.* at 15. Pretrial programming was suspended and frequently interrupted, and inmate recreational time depended entirely on the state of COVID in the facility. In November 2020, during one of the larger outbreaks at Wyatt, John tested positive for COVID-19. PSR ¶ 71. The course of his illness involved body aches, headaches, coughing, and fatigue that lasted for approximately one month, though he continues to experience body aches and fatigue to this day. Ex. 1 at 17. Despite the stress and anxiety caused by lockdowns and isolation, however, John has not incurred any disciplinary infractions and has comported himself well. PSR ¶ 5.

Despite these struggles, John is committed to bettering himself and has been dedicated to the most productive and positive activities he can. From the Fall of 2020 through present, John has been a worker on his unit at Wyatt. *Id.* at ¶ 5. As a unit worker, John serves fellow inmates' meals and helps to clean his unit. He sought out the work because – consistent with his character – he was looking "for opportunities to be helpful," and he "values [the work] because it adds structure and purpose to his day." Ex. 1 at 18. Jennieva, John's sister, explained that John is "heavily influenced by the people around him, and does well when he is surrounded by positivity and industry." *Id.* at 14. ███████████████ John "has a good repertoire of coping skills that he learned in his psychotherapy," and that notwithstanding the difficulty of his imprisonment, "he is employing these constructively to manage the difficult circumstances of detention and isolation." *Id.* at 19.

<u>**ARGUMENT**</u>

**A SENTENCE OF 42 MONTHS IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO EFFECTUATE THE SENTENCING GOALS OF 18 U.S.C. § 3553(a).**

John has pled guilty to an information charging interfering with a law enforcement officer during the commission of a civil disorder, in violation of 18 U.S.C. § 231(a)(3), possession of a firearm by a person under felony indictment, in violation of 18 U.S.C. § 922(n), and assaulting a federal officer, in violation of 18 U.S.C. § 111(a), (b), pursuant to a binding plea agreement in this case under Fed. R. Crim. P. 11(c)(1)(C). This plea agreement provides for a sentencing range of 42-63 months.[31] A 42-month sentence, which is below the advisory guideline sentencing range and the low-end of the parties' plea agreement, is sufficient and just punishment to effectuate the goals of sentencing, and would sooner permit John to engage in the treatment recommendations ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "the prognosis for Mr. Boampong is good" and he is "highly motivated to be a constructive and contributing member of the community and a good example to his young son," and asks for the opportunity to do that. *Id.*

The United States Supreme Court, recognizing the immense discretion afforded to sentencing judges, advised that sentencing courts should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). The First Circuit stressed that sentencing determinations require a "more holistic inquiry" than simply plugging numbers into a guidelines calculation, and that, at least in the federal context, the federal statutory factors to be considered are "a tapestry of factors, through which runs the thread of an overarching principle [of parsimony]." *See United States v. Yonathan Rodriguez,* 527 F.3d 221, 228 (1st Cir. 2008), citing *Kimbrough v. United States,* 562 U.S. 85, 101 (2007). That

---

[31] *See* D.E. # 19.

overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the court should "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id.* (emphasis added).

The government leads their sentencing memorandum citing to the magistrate judge's basis for ordering John's pretrial detention, and although accurate in its recitation of the seriousness of the offense, that factor – the nature and gravity of the offense – appears to be the sole driving force of its sentencing recommendation. A holistic view of John's life and a consideration of the circumstances that led to this offense, however, are necessary to determine a just sentence in this case. Based ███████████████████████████████████ and the letters of support, John's personal history, the cascading and traumatic losses he suffered, and the mental health crisis in which he was enmeshed at the time of the offense are all significant mitigating factors warranting the imposition of the 42-month sentence requested herein.

*U.S. Sentencing Guidelines*

While courts must *consider* the sentencing guidelines, the Supreme Court has held that the Court may not presume that the guideline sentencing range is reasonable, and Congress has *required* federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. § 3553(a). *Kimbrough*, supra; *Gall v. United States*, 552 U.S. 38 (2007). The calculation of the guidelines as expressed in the plea agreement pre-sentence report is accurate. After adjusting for acceptance of responsibility, John's total offense level is 24. PSR ¶ 41. With a criminal history category I, the resulting advisory sentencing range is 51-63 months imprisonment and supervised release between 1-3 years. *Id.* at ¶ 46, pg. 25. Notwithstanding this the parties' binding plea agreement provides for a sentencing range of 42-63 months and a 3-year term of supervised release. *Id.*; D.E. # 19.

The two-dimensional grid guideline, which generally considers two relevant factors (offense level and characteristics, and prior criminal history), obscures the differences between individuals with vastly diverse backgrounds who happen to fall in the same cell of a grid.[32] For this reason, the sentencing guideline range should be just the starting point for a consideration of a fair and just sentence.

*Rehabilitation, Need for Treatment, and Clinical Recommendations*

The risk of recidivism and relapse are important issues that courts should consider when fashioning a just sentence, and a defendant's mental health issues and need for treatment are directly correlated to those risks. ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████ His prior extensive treatment, counseling, and medication compliance history contributed to her opinion that John's overall prognosis was "good." *Id.* at 19. Noting that work has been a "particularly healthy outlet" for John, ████████████████████████ John's good prognosis on his extensive work history and the enthusiasm with which he approaches his jobs. *Id.*

███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████ ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████ A below-guideline sentence of 42 months would best

---

[32] Michael Smith, *Let Specificity, Clarity, and Parsimony of Purpose Be Our Guide*, 20 Law and Pol. 491 (1998).

enable John to engage and achieve that treatment, and enable him to, in the words of the late Chief Justice Gants, "get past the past."[33]

*Nature of Imprisonment: Programming Availability and Earned Time Credits*

In addition to the harsh nature of pretrial detention which John has already endured during the COVID-19 pandemic, his offenses of conviction will have a direct effect on the nature and length of sentence John that serves in this case. Specifically, John's conviction under 18 U.S.C. § 111(b) categorically and automatically disqualifies him from earning time credits ("ETCs") under the First Step Act ("FSA") through successful completion of FSA-approved programs in the Bureau of Prisons. *See* 18 U.S.C. § 3632(d)(4)(D). The FSA-approved programs involve specific Evidence-Based Recidivism Reduction Programming and Productive Activities, and are focused on education, family/parenting, finance/poverty; trauma; and work.[34]

The logical and likely result of his ineligibility to earn ETCs due to the 111(b) conviction would be his de-prioritization for participation in FSA programming. Consistent with many inmates' experience, for example, with the Residential Drug Abuse Program in the BOP, not only are those individuals who are eligible to receive sentence reductions upon successful RDAP completion prioritized for RDAP, but those who are ineligible are often dissuaded by staff and other inmates from even applying for placement. Thus, it is logical to expect that FSA

---

[33] Remarks by Chief Justice Ralph Gants, Supreme Judicial Court, Univ of Mass – Boston, Mar. 16, 2015 (A "sentence should be crafted to best enable the defendant […] to 'get past the past,' that is, to address the problems that brought the defendant to the courtroom in order to diminish the risk that he […] will commit additional crimes."), available at: https://www.mass.gov/doc/remarks-at-the-university-of-massachusetts-boston-march-16-2015/download.

[34] *See* Bureau of Prisons' First Step Act Approved Programs Guide, July 2021, available at: https://www.bop.gov/inmates/fsa/docs/fsa_program_guide_2107.pdf. Specific EBRR programming from which John would benefit and which would greatly shape his future success and reduce recidivism include: Career Technical Education Program (including apprenticeship training, certification course training, and vocational training); specific cognitive behavioral therapy programs, including: BRAVE (Bureau Rehabilitation and Values Enhancement); the Resolve program; Cognitive Processing Therapy; Criminal Thinking; National Parenting from Prison Program; Federal Prison Industries, Inc./UNICOR Job Training; Life Connections and Threshold Programs (faith-based re-entry work); and post-secondary education.

programming would be reserved & implemented for those who can benefit from it. Moreover, without ETCs, John will be ineligible to reduce his sentence even if he is able to participate in the FSA-approved programming, and his time in prison would be – *day for day* – longer and harder than those inmates sentenced to the same term of imprisonment who are otherwise eligible for such ETCs. He recognizes that this is a consequence he must suffer by virtue of his conduct and crimes, but he asks that it be factored into the Court's consideration of what an appropriate sentence is in this case.

*The Loss and Importance of Face-to-Face Fatherhood*

John's personal history and his own efforts to be a better parent to his son than his father was to him support the sentence requested herein, as it would sooner return John to his son's life. *See* Ex. 1 at 17 (describing John's concerns about his son's current functioning, noting ▌▌▌▌ "is not coping too well" with John's incarceration). Growing scientific and medical evidence shows that having a parent incarcerated can have both immediate and lasting impacts on the physical health of a child, and the phenomenon of having a parent incarcerated is designated as an "Adverse Childhood Experience," or ACE, by the Center for Disease Control – a classification which also includes physical and sexual abuse, violence and other household challenges, and physical and emotional neglect.[35] Children with an incarcerated parent are more likely to be displaced from their home, becoming homeless or entering foster care, engage in high-risk behaviors, do poorly in school, and socially isolate themselves.[36] Defendants who remain in a caretaking position for their children generally recidivate less, improve their parenting skills, and

---

[35] *About the CDC-Kaiser ACE Study*, https://www.cdc.gov/violenceprevention/acestudy/about.html (last accessed December 7, 2020).
[36] *Keeping Kids and Parents Together: A Healthier Approach to Sentencing in Massachusetts*, September 2017, 14-16, https://humanimpact.org/wp-content/uploads/2018/10/KeepingMAKidsParentsTogetherHealthier_2017.09.pdf.

are overall more successful with rehabilitative programming than incarcerated parents.[37] John's sister-in-law describes how devastating John's imprisonment is, and will continue to be, for their family, and that ██████ "is entering pivotal years of development as he matures into a young man and would be best served by his father being present in his life." Ex. 5.

John has sought to insulate his son, nieces and nephews, and godchildren from the realities of his imprisonment. He does this not to minimize his conduct or lie, but to try to avoid the impacts described above, and to preserve what remains of ██████ youthful hope that he may soon be reunited with his father. John recognizes that it is solely a consequence of his own conduct that he appears before this court to be punished, but wishes above all to avoid inflicting the same trauma and parental alienation on his son that his father inflicted on him as a child.

*Comment on Sentencing Disparities*

The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct is codified in 18 U.S.C. § 3553(a)(6). The U.S. Sentencing Commission provides some limited data of dispositions for defendants whose primary guideline was U.S.S.G. § 2A2.2: *in the last five fiscal years* (2016-2020), only 19 offenders with John's same criminal history category (I) and offense level (24) were sentenced in federal court.[38] The data do not take the defendants' race, mental health history, background or other mitigating factors into account. As a result, the Court cannot draw easy comparisons between those cases and this one. The information and inferences that *are* clear from this data, however, is that none of those similarly-charged cases occurred in the midst of the COVID-19 pandemic or in the aftermath of the killing of George Floyd; both of which John maintains were critical to his case.

---

[37] *Id.* at 11-13, 17-18.
[38] *See* U.S. Sentencing Com'n, Judiciary Sentencing INformation data for Primary Guideline § 2A2.2 at cell I, 24 (emphasis added),https://jsin.ussc.gov/analytics/saw.dll?Dashboard

A cursory review of protest-related charges and offenses during the same time period as John's case does reflect the anomalous and unplanned nature of John's conduct, and the difficulty of drawing comparisons here. For example, a man charged in Minnesota federal "admitted that he fired 13 rounds from an AK-47 style rifle into the 3rd precinct police station on May 28, 2020, as other rioters looted and set fire to the building after police evacuated."[39] The man, a member of the Boogaloo Bois, wanted to start a new civil war, and admitted that he "traveled to Minneapolis from the San Antonio area to sow chaos after the police murder of George Floyd."[40] He was charged not with assault on an officer, but with riot, pursuant to 18 U.S.C.§ 2101, and his advisory guideline sentencing range is between 37-46 months.[41] Another man – identified but not yet charged – whose "actions quickly led to the first of several arson fires that police say transformed peaceful protests into local danger zones" in the aftermath of the murder of George Floyd was later identified as a white supremacist who aimed to stir racial tensions.[42] Unlike these false flag operations, designed to ignite racial tensions and to destabilize a vulnerable city, John's conduct in this case was a devastating aberration borne out of deep pain and trauma, and likely to be ameliorated and never repeated again with proper treatment and supports.

## CONCLUSION

Rather than a reflection of his true nature or character, John Boampong's conduct in this case represents the culmination of his psychological distress and personal instability in the context of devastating loss and trauma. For the foregoing reasons, John asks the Court to impose a sentence

---

[39] Matt Sepic, "Texas man, 24, admits shooting at Minneapolis police station during riot," *MPR News*, Sept. 30, 2021, available at: https://www.mprnews.org/story/2021/09/30/texas-man-24-admits-shooting-at-minneapolis-police-station-during-riot; *see also United States v. Ivan Harrison Hunter*, Dkt. No. 0:20-cr-00250-MJD-ECW (D. Minn. 2020).
[40] *Id.*
[41] *Id.*
[42] Karma Allen, "Man who helped ignite George Floyd riots identified as white supremacist," *ABC News*, June 29, 2020, available at: https://abcnews.go.com/US/man-helped-ignite-george-floyd-riots-identified-white/story?id=72051536

of 42 months followed by three years of supervised release.

Respectfully submitted,

*/s/ Sandra Gant*
Sandra Gant
BBO #: 680122
Federal Defender Office
**Temporary Mailing Address:**
P.O. Box 51268
Boston, MA 02205
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 25, 2021.

*/s/ Sandra Gant*
Sandra Gant