```
 1                  UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS (Boston)

 3                              No. 1:20-cr-10321-WGY

 4

 5     UNITED STATES OF AMERICA

 6

 7     vs.

 8

 9     JOHN BOAMPONG

10

11                        * * * * * * * * *

12

13                     For Hearing Before:
                       Judge William G. Young
14

15                          Sentencing
16

17
                       United States District Court
18                     District of Massachusetts (Boston.)
                       One Courthouse Way
19                     Boston, Massachusetts 02210
                       Tuesday, October 26, 2021
20

21                        * * * * * * * *

22
                   REPORTER: RICHARD H. ROMANOW, RPR
23                      Official Court Reporter
                     United States District Court
24      One Courthouse Way, Room 5200, Boston, MA 02210
                       bulldog@richromanow.com
25
```

```
 1                    A P P E A R A N C E S

 2

 3    JOHN T. DAWLEY, JR., ESQ.
         United States Attorney's Office
 4       John Joseph Moakley Federal Courthouse
         1 Courthouse Way, Suite 9200
 5       Boston, Massachusetts 02210
         (617) 748-3207
 6       Email: John.dawley@usdoj.gov
         For the United States of America

 7

 8    SANDRA M. GANT, ESQ.
         Federal Defenders Office
 9       51 Sleeper Street, 5th Floor
         Boston, Massachusetts 02210
10       (617) 223-8061
         Email: Sandra_gant@fd.org
11       For the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2          (Begins, 12:00 p.m.)

3          THE CLERK:  Criminal Matter 20-10321, the United

4     States of America versus John Boampong.

5          THE COURT:  Just a word as we begin about the mask

6     protocol.  Everyone will wear masks in the courtroom.

7     As for counsel and Mr. Boampong and myself, you need not

8     wear your mask while speaking, but of course you're

9     welcome to.

10          And now would counsel identify themselves and who

11     they represent starting with the government.

12          MR. DAWLEY:  Good afternoon, your Honor, John

13     Dawley for the United States.

14          MS. GANT:  Good afternoon, your Honor, Sandra Gant

15     on behalf of John Boampong.

16          THE COURT:  And may I talk to him directly for a

17     moment?

18          MS. GANT:  Yes, of course, your Honor.

19          THE COURT:  Mr. Boampong, have you read the

20     presentence report that's been prepared in your case?

21          THE DEFENDANT:  Yes, I have.

22          THE COURT:  And have you talked it all over with

23     your attorney?

24          THE DEFENDANT:  Yes, I have, your Honor.

25          THE COURT:  And do you believe you understand it?

1          THE DEFENDANT:  Yes, I do.

2          THE COURT:  Thank you.  Be seated.

3          Nothing has been withheld from the presentence

4     report under the rules of criminal procedure?

5          PROBATION OFFICER:  No, your Honor.

6          THE COURT:  Very well.

7          This is a sentencing that proceeds under 18 United

8     States Code Section 3553(a).  Sentencing in this session

9     of the court -- while in this instance it involves only

10    three steps because Mr. Boampong has pled under a

11    C-plea, rather he has tendered a plea, and, um, let me

12    start by saying the Court accepts that plea agreement.

13    So that limits the flexibility of the Court in imposing

14    sentence.  I don't mean that in any critical way, um,

15    the rules provide for it, and, um, after careful

16    consideration I have accepted the binding plea

17    agreement.

18          I do, since I have the flexibility to impose a

19    sentence of not less than 42 months nor as much as 63

20    months, consult the available, um, sentencing

21    statistics.  I do not sentence from any statistical

22    measure, but I do consent -- I do consult the actual

23    statistics better to decide the weight to be given to

24    the now, um, nonmandatory advisory guidelines.  And the

25    United States Sentencing Commission has come up with a,

1    um, really a very good, um, computer, um, calculation

2    that goes offense by offense and takes into account the

3    criminal history.

4         If I look at their data, it shows that for the

5    count of interfering with law enforcement officers

6    during a civil disorder, the average sentence was 52

7    months.  That's also the average for assaulting,

8    resisting, or impeding certain officers or employees.

9         If I look at the database maintained by

10   Mr. Romanow, I have only sentenced once for similar

11   offenses, so that's far from an average, and the

12   sentence there was the average sentence -- well actually

13   I sentenced twice and the average was 6 months.

14        Now I must still calculate the sentencing

15   guidelines and I'll proceed to do that.  If anyone

16   differs with any of the calculations that the Court

17   makes, I want you to interrupt me and I will, um, see if

18   I can't resolve the issue.

19        In this case the, um, offense -- the base offense

20   level is 14.  A firearm was discharged, so I add 5

21   levels.  And given the conviction under Section 111(b),

22   I add another 2 levels.  Here the victims were

23   government officers and employees, I add another 6

24   levels, that takes us to 27.  I do subtract 3 levels for

25   the guilty plea, that takes us down to 24, Criminal

1    History Category 1, which gives us a range of 51 months

2    to 63 months, a period of supervised release of not less

3    than 1 nor more than 3 years, a fine of not less than

4    $20,000 nor more than $200,000.  No request has been

5    made for restitution.  And there must be a $300 special

6    assessment.

7          Mr. Dawley, are the sentencing guidelines

8    accurately calculated?

9          MR. DAWLEY:  Yes, your Honor.  Thank you.

10         THE COURT:  Ms. Gant, are they accurately

11   calculated?

12         MS. GANT:  They are accurately calculated, your

13   Honor, and they are also mirroring what's in the

14   parties's agreement.

15         THE COURT:  I understand.  Very well.  So those

16   are the sentencing guidelines and the Court adopts them,

17   and the Court has adopted the binding plea agreement.

18         Because there are determinations I must make, we

19   now turn to the meat of the matter and that is I will

20   hear the government, I will hear Ms. Gant, I will hear

21   from Mr. Boampong if he wishes to be heard from.  I have

22   read with care all the memoranda and associated

23   materials that have been submitted.

24         Mr. Dawley, I'll hear you.

25         MR. DAWLEY:  Thank you, your Honor.

1          Your Honor, the government in this matter is

2   recommending a 63-month period of imprisonment, 3 years

3   of supervised release thereafter, along with the other

4   terms that we've laid out in our sentencing memo, which

5   I do rely on, um, as well as argument, a fine at the low

6   end, as well as forfeiture and a $300 special

7   assessment.

8          Your Honor, the government, in coming to this

9   recommendation, reviewed all the materials extensively

10  and what we have come to, your Honor, is a

11  recommendation within the guidelines based largely on

12  the conduct of the defendants that night.

13         Your Honor, in terms of -- I've read not only, um,

14  the presentence report, but what counsel has filed and I

15  believe somewhere in there the defendant had indicated

16  that this was a low point of his life, one of the worst

17  times of his life.  I would submit, your Honor, in terms

18  of the government's recommendation, that the Court take

19  into consideration that that night, June 1st, 2020 at

20  around 3:00 p.m., was one of the worst moments in the

21  lives of over 10 police officers, Boston Police

22  officers, and that this incident, during riots in the

23  wake of George Floyd's death, starting on May 31st in

24  Boston and going late into the night on June 1st,

25  involved looting, violence all over the city, police

1    officers had rocks thrown at them, bricks thrown at

2    them, M80s and fireworks fired at them, and 53 people

3    were arrested in this rioting time.  Mr. Boampong was

4    one of those individuals.

5        These officers that night, your Honor, were

6    outnumbered, they had to maintain order in a very large

7    area in Boston, and then while they're doing that, or

8    attempting to do that, at 3:00 in the morning, shots

9    rang out and these police officers frankly in that

10   moment didn't know if they were going home that night.

11       Your Honor, the facts of this case, as the Court

12   has heard, is an incident on June 1st, 2020 at

13   3:00 p.m., it occurred right near Downtown Boston, the

14   area of Arlington and Boylston Streets, and there was a

15   lot of looting going on in that commercial area.

16       The defendant was driving a car with several other

17   occupants, he was told to leave the area due to the

18   looters.  The occupants of his vehicle, it was him, his

19   girlfriend, a cousin, and a cousin's husband.  The

20   occupants of that vehicle began to be verbally combative

21   with the police officers.  The police officers

22   eventually got Mr. Boampong to move his car and what he

23   did was he put the car in reverse.  When he put the car

24   in reverse, he started to back up into where a number of

25   other police officers who were trying to maintain order

1    were standing.  They yelled at him -- they shouted to

2    him to try to get his attention, they yelled at him to

3    stop.  It was only after a police officer had to bang on

4    the roof of Mr. Boampong's car that they eventually got

5    him to stop before he was going to strike police

6    officers or cars that were behind him.  Mr. Boampong

7    then took off, um, leaving that area and drove away.

8         Your Honor, that -- in essence that night should

9    have been the end of it.  It was not.  What occurred is

10   that a short time later video surveillance cameras

11   picked out Mr. Boampong's car, um, that he essentially

12   drove around in a circle, had driven around the area

13   where those police officers were, as he went down and

14   around to a side street, Providence Street.  That he got

15   out of the car and walked back towards that area of

16   Arlington and Boylston Street where over 10 police

17   officers were still standing, amongst them one in which

18   is a Federal Task Force Officer, Timothy Stanton, and

19   then he took a firearm out of that vehicle, walked in

20   the direction and fired not one, not two, but eleven .9

21   millimeter rounds in that direction.  The police

22   officers had to take cover, all believing that they were

23   being shot at, as was shown on the video surveillance,

24   and Mr. Boampong immediately thereafter got back in his

25   car and drove way.

1    Your Honor, in terms of the ballistic evidence

2    that was located on that scene, um, as well as in the

3    side of the building, two of those bullets -- nobody was

4    injured, thank God, but in terms of those bullets, two

5    of those bullets entered that apartment building, which

6    is above the commercial stores on Arlington, Boylston

7    and they entered the window of apartments, um, two

8    apartments that were there on that corner.  Again

9    luckily those apartments weren't being rented at the

10   time, they were unoccupied.  But again in terms of this

11   conduct that I come back to is what the Court has to

12   take into consideration in sentencing Mr. Boampong

13   today.

14       As I indicated, he drove off, um, Mr. Boampong

15   did, and was stopped after a brief pursuit.  On the

16   passenger area on the floor was a semiautomatic Sigsauer

17   .9 millimeter firearm, um, Mr. Boampong's fingerprint

18   was on that firearm.  There was also a black trash bag

19   with various items, um, consistent with the looting that

20   occurred in that area, liquor, clothing, and jewelry.

21   And after Mr. Boampong was ***Mirandized*** he did admit that

22   he committed the shooting and stated that he was upset

23   that the police had broken his windshield.

24       Your Honor, this conduct -- and again I can't

25   emphasize it enough, it is egregious and it is

1    abhorrent, and it is a miracle that nobody was hurt or

2    killed that night by Mr. Boampong's direct actions.

3         Your Honor, in terms of coming to our

4    recommendation of the 63 months, we do feel it is

5    appropriate, we feel it is reasonable and necessary here

6    based on the 3553(a) factors.  We have taken in

7    consideration, um, in speaking with the victims on this

8    matter, speaking with a number of Boston Police

9    officers, including Detective Stanton on that matter,

10   we've told them what our recommendation is and, um, in

11   terms of their thoughts on that recommendation, they're

12   not here today but they are supportive of our

13   recommendation.

14        I will say that in terms of my specific role in

15   the U.S. Attorney's Office doing Project Safe

16   Neighborhood in Boston, Tim Stanton is a Boston Police

17   officer, has been for a long time, he's also a Task

18   Force Officer with the Metro Boston Gang Task Force.  I

19   had the opportunity to work with him on almost a daily

20   basis as well as several of the other police officers

21   that were involved in this incident.  I can say that

22   Detective Stanton is on a totally-unrelated search

23   warrant today, but he has been kept in the loop, as have

24   the other officers through myself and through AUSA

25   Garland and through the FBI, and they fully endorse the

1   U.S. Attorney's Office's recommendation at this time

2   given the circumstances here.

3       Your Honor, again in terms of the government's,

4   um, recommendation, I think it's, um, taken into

5   consideration the nature of the offense here as well as

6   general and specific deterrence, and Mr. Boampong's

7   characteristics, which I'll get to in a minute.  But in

8   terms of nature of the offense here, um, what you just

9   heard was a set of facts that is extremely, extremely

10   dangerous, and it's not just extremely dangerous to

11   possess a firearm, it's not just extremely dangerous to

12   fire it, to fire it 11 times, but also in the area of

13   where government officials are working.  And I just laid

14   out what the circumstances that those government

15   officials were in.

16       Your Honor, what I can't emphasize enough, and

17   think Mr. Garland put it in our memo very well, is that

18   government officials should be allowed to do their jobs

19   without fear of violence, especially when they're at

20   their most vulnerable times, um, as was the time like

21   this, the night of this rioting in Boston.

22       Your Honor, going back to the protest, um, I know

23   we've had this pandemic now, we had the protest, and it

24   is kind of hard at times to go back to that night and

25   what a horrible night that was, and what a tumultuous

period of time that was, um, but in terms of the Court's recollection of that time, um, and all of our recollections of that time, I do hope that that does never happen again, but unfortunately we live in a world where it's a very realistic possibility that something like this could happen again.

The purpose of this sentencing today -- um, one of the purposes of the sentencing today, and the government's recommendation for this 63-month period of imprisonment, is not just specific deterrence for Mr. Boampong, but general deterrence to any individual that thinks that they're going to go well beyond their freedom of speech and right to protest and to take matters into their own hands the way Mr. Boampong did that night.

Your Honor, in furtherance and in specific deterrence to Mr. Boampong, I would submit, and we have laid out, um, that this is a reasonable sentence.  In terms of the consideration, this was a C-plea to arrange, um, and did also take into consideration that Mr. Boampong was facing the very real possibility of a 924(C) charge, which would be a 10-year minimum mandatory sentence on and after whatever he received for the counts that he has pled guilty on the information here.  And, your Honor, I submit that in coming to our

1    recommendation -- and laying that out for the Boston

2    Police officers in terms of the possibilities of what

3    could happen here today, that has all been taken in

4    consideration and Mr. Boampong has been given that

5    benefit in terms of resolving that matter on the charges

6    he's currently resolving it on.

7        So with all that being said, Judge, I'll leave it

8    with what is the lowest sentence reasonably necessary?

9    And I know that counsel in her memo has addressed this

10   at length.  She has -- counsel has indicated a lot of

11   Mr. Boampong's history, in fact in essence his life

12   story, and I've read through that and I've gone through

13   all of that and his characteristics, but what I say to

14   that, your Honor, is that, um, unfortunately pretty much

15   everyone who's come through this courthouse who has

16   committed crimes has had some hardships in their life,

17   has had to go through good times and bad, and on the

18   other side, your Honor, a lot of people who come before

19   the Court, almost everybody, do have family members,

20   friends, people that support them and love them, and yet

21   most people in our society are able to avoid committing

22   a crime so egregious as to what Mr. Boampong did that

23   night at 3:00 in the morning on June 1st.

24       I would ask the Court to take into consideration

25   what we have laid out in our memo.  Mr. Boampong has

1    talked about -- at length about his background before

2    that night, um, but I just don't get how, um,

3    Mr. Boampong, um, can in any way say that that might be

4    a justification for what was done or that there was a

5    mistake by what he had done.  Your Honor, what he did

6    that night was to possess a gun, possess a firearm that

7    he's prohibited and he knows that he's not allowed to

8    possess.  He went there that night, um, and had a car --

9    was driving a car with stolen merchandise in it, and he

10   brought that firearm in that car, that was loaded, to a

11   riot.  And given all the history he's had with the

12   police, he had that gun loaded with numerous rounds of

13   ammunition.  And this, your Honor, wasn't some, um,

14   reaction, this wasn't some mistake, this was a series of

15   deliberate decisions that Mr. Boampong made that night

16   and deliberate decisions that led to a very serious

17   crime.

18        Your Honor, in terms of the lowest possible

19   recommendation that is reasonably necessary here, the

20   defense has asked -- they will ask for a period of

21   essentially 3 1/2 years.  Your Honor, in terms of the

22   government's recommendation here, it is taken into

23   consideration that he fired not once, not twice, but 11

24   times after this interaction with Boston Police

25   officers, causing these police officers, who had been

1    out all night dealing with rioting and looting, to fear

2    for their lives, that they were being shot at.  Your

3    Honor, in terms of what is reasonably necessary to

4    enforce here before the Court, quite frankly 3 1/2 years

5    is just not simply enough.

6         Your Honor, the 63 months here takes into

7    consideration all the 3553 factors here and quite

8    frankly, your Honor, it's a miracle that somebody wasn't

9    hurt or killed.  It's also a miracle, Judge -- and he

10   had three other occupants in his car, it is equally

11   thankful that the police were able to stop him, but also

12   didn't return fire and didn't kill or injure any of the

13   other individuals involved in this.

14        So given the totality of the circumstances here,

15   your Honor, I reiterate again, um, this was not a

16   mistake, this is an extremely dangerous crime, um, and

17   this is crime and violence against a federal officer and

18   numerous police officers.  I think Judge Kelley

19   indicated in her detention, which is leading our

20   sentencing memo, that the fact that no one was injured

21   or killed that night is simply miraculous.  So given the

22   totality of the circumstances here and the seriousness

23   of Mr. Boampong's conduct, we would recommend to the

24   Court the 63 months in prison, 3 years of supervised

25   release thereafter, along with those other terms.

1        Thank you, your Honor.

2        THE COURT:  Thank you.

3        Ms. Gant, um, naturally I've read your materials

4   very carefully.  The nub -- because I want you to

5   address it, he possesses a firearm.  He has no right to

6   be out there with a firearm.  And more than that, he

7   shoots it repeatedly.  That's the nub here.  I'll hear

8   you.

9        MS. GANT:  That is the nub, your Honor, and

10  frankly if that were the only consideration that the

11  Court were to take, then the Court doesn't need to go

12  further than the government's focus on the

13  seriousness of the offense here.

14        There are two things that the government said that

15  we absolutely agree with, the first is that this was a

16  very serious crime.  John Boampong knows that.  The

17  second thing the government said is that it's hard for

18  many of us to think back on the night of June 1st, 2020

19  and remember how chaotic, how upsetting, how devastating

20  it was not just to the City of Boston, but to other

21  cities in which protests were happening.  But it was not

22  hard to remember for Mr. Boampong.  It is not hard for

23  Mr. Boampong to remember June 1st of 2020 because it was

24  the worst night of his life, it was the worst decision

25  he ever made, and it was the culmination of significant

trauma and pain, and frankly the destabilizing

experience that he had in the months that preceded it.

He knows he shouldn't have possessed a gun.  He

knows he shouldn't have fired it.  He will tell you that

he wishes he had gone home to his son, Jeremiah, and

that he replays that night every single day that he's in

jail and will continue to do so frankly for the rest of

his life because he is ashamed of his conduct, because

he is grateful that nobody was hurt.  But the problem

with the government's sentencing memorandum and its

argument today is that it gives less than short-shrift

to his personal history, to his trauma, to his lived

experiences as a black man in Boston, to his prior

traumas with police officers, and to his particular

vulnerability in June of 2020, which was just one week

after witnessing the life snuffed out of George Floyd by

a Minneapolis Police officer and just after the one-year

anniversary of the death of his mother, which was an

event that impacted him beyond measure.  Only one

sentence of the government's sentencing memorandum is

devoted to discarding these facts and elements that

propelled John Boampong to his lowest point on June 1st

of 2020.  And as an advocate, I've been tasked with

telling Mr. Boampong's story and speaking on his behalf,

but if there's anything that the last several years have

1   shown us is that as a white American, as a white woman,

2   I can never truly understand the depth or extent of his

3   pain or the black pain in America.

4        I have --

5        THE COURT:  Should that, um, ameliorate the

6   sentence?

7        MS. GANT:  It should not ameliorate it and it

8   certainly doesn't justify it, and he never attempts to

9   justify it.  The government's characterization that he

10  uses his past experiences as a justification or his

11  lived or perceived experiences of racism to explain or

12  justify his actions is inaccurate.  A close reading of

13  the defendant's sentencing memorandum says that this is

14  one of the things that the Court must take into account.

15       And the history of racism is not history for John

16  Boampong and it is not an issue necessarily that I think

17  the Court, um, needs to find as a justification.

18  Instead his lived and perceived experiences of racism

19  permeated his daily life, it permeated how he walks down

20  the street, how he interacted with police officers, the

21  fear that consumed him when he interacted with police

22  officers, and, um, it informed -- it's impossible to

23  separate his actions from those experiences.

24       And I want to take a moment just to talk about

25  what happened to him in 2010, because that was a truly

traumatic experience.  In the words of those closest to

him, it was "absolutely traumatizing."  He was

hospitalized for 18 days after an encounter with police

where he was beaten, he was pepper-sprayed, and his

infant son, Jeremiah, was pepper-sprayed, as his partner

helped him.  After that 18-day hospitalization, John

Boampong sank into a deep depression.  He was

hospitalized for a suicide attempt, he was ultimately,

um, underwent therapy and medication for many years, and

the importance of that is because that was a stabilizing

and solidifying factor that kept him on solid ground for

many years.

        After the death of his mother in 2019, John

Boampong started to destabilize, and that is borne out

by the report of Dr. Reid and by the descriptions of

those closest to him.  Because his actions ultimately on

June 1st, 2020 were borne out of very specific and very

unusual circumstances that I don't think are ever likely

to be repeated.  And again we have never used these as a

justification.  And I really went through extreme

measures to impress upon the Court that Mr. Boampong

doesn't see any of this as a justification or excuse.

        But by May of 2020, John Boampong was frankly

rudderless in this perfect storm of events.  He lost his

mother one year prior, he was wracked with tremendous

1   guilt over her passing.  His relationship with his long-

2   time partner was broken and that ended.  He sank into

3   himself, into a deep depression.  When the Covid 19

4   pandemic hit, he not only lost his job where he was on a

5   management track, but Cogman Square Health Center closed

6   and he was unable to engage in the therapy that had kept

7   him afloat for years.  His medications ran out and he

8   was unable to immediately renew them.  And so the John

9   Boampong that the Court should evaluate is frankly two

10  people.  First, is the John Boampong on the night of

11  June 1st, 2020, and the second is the John Boampong who

12  is stable, feeling well, and is frankly a model for the

13  children of his community.

14      We have all had time and distance and information

15  to process George Floyd's death, but John didn't have

16  that on June 1st.  So when the Court asked, "Is race an

17  issue that should ameliorate his offense?"  I wouldn't

18  say that it is, I wouldn't say that it is something that

19  ameliorates his offense, but it absolutely is a factor

20  in his life that is unavoidable.  Because if the Court

21  cannot see color, if the government cannot see color,

22  then they can't see John Boampong.

23      Ultimately in this case, Dr. Reid I think said it

24  best, he said in the settings of these losses and his

25  psychological deterioration, when John was drinking

1    heavily in leading up to this offense, he was more

2    vulnerable to behaving more impulsively and

3    thoughtlessly.

4         THE COURT:  But you see those things about

5    Mr. Boampong, and all sentencings necessarily is

6    individual, and so it is this Court's obligation to see

7    him, and when you say if we don't take these things into

8    account, we don't see him, well you're right in the

9    sense that it's my absolute obligation to see him, this

10   man.  But you must acknowledge, that's not my only

11   obligation, my obligation is to see the needs of

12   society, on that night, in those circumstances, in the

13   legal framework that we have, which was on the verge of

14   breaking down, with officers who are out there doing

15   their job.

16        So, um, you're of course right, but I'm groping

17   for how do I take that into account against firing off

18   11 rounds on a night of rioting and looting?

19        MS. GANT:  I think the question isn't to explain

20   or justify his offense, but to understand why it

21   happened and how he got to that point.

22        THE COURT:  Well suppose -- and you're doing it

23   very well.  But then I must ask myself "And so" --

24        MS. GANT:  "And so," and I can get there, your

25   Honor.

1          THE COURT:  "And so?"

2          MS. GANT:  "And so," because this was a very

3    particular and unique set of circumstances that propels

4    him to that night, the Court has an outline in

5    Dr. Reid's report that essentially explains what are the

6    factors that are necessary to keep John Boampong stable,

7    safe, and to keep the community safe?  And ultimately

8    she says that because that night, where he was

9    particularly vulnerable to irresponsible and dangerous

10   decisions based on everything, the perfect storm that

11   came before, that if we identify specific resources and

12   treatment avenues, that John Boampong will be stable.

13   And she specifically makes recommendations for

14   treatments that involve individual psychotherapy, a

15   medication regimen -- which he was not adhering to at

16   the time due to the cessation of services during the

17   pandemic, substance abuse treatment, which he was not

18   engaged in before and in which he himself admitted that

19   he had been using as a coping mechanism since his

20   mother's death, and ultimately that this may be a

21   perfect case for something like Restorative Justice,

22   because John Boampong is not anti-police.

23         THE COURT:  Understand we have a binding plea

24   agreement, he's going to prison for at least 32 months.

25         MS. GANT:  Yeah.

1           THE COURT:  Okay.

2           MS. GANT:  I think -- the reason I raise the issue

3       of Restorative Justice is -- I had meant to include it

4       in the memorandum, um, because I think this may actually

5       be a fairly perfect case for it when he's released as

6       part of his supervised release terms.

7           The officers who encountered John Boampong that

8       night didn't know him, they didn't know his history,

9       they didn't know what his particular issues were, and

10      what his history was.  But he also didn't know them and

11      he didn't know necessarily the impact that his actions

12      would have had, and that is a problem.

13          THE COURT:  But that's an aspect of life in an

14      urban area, that's one reason that police officers wear

15      uniforms, they're not known.  And I understand the

16      concept of neighborhood policing and the like, but in

17      circumstances such as this they're not known to the

18      people on the street, but they have every right to be

19      obeyed such that the peace of the community may be

20      maintained.

21          MS. GANT:  And we don't disagree with you, by any

22      means we don't disagree with you.  The night that was

23      described by the government was one of absolute chaos.

24      John Boampong was not involved himself in looting, he

25      picked up passengers who were suspected to have engaged

1    in the receipt of some property, but that not John.  His

2    huge error, first, was having a gun in that car, and the

3    second was turning around and firing it.  He knows that.

4    The sentence that the Court imposes is not going to

5    communicate to John Boampong that that was wrong, he is

6    frankly a man of God, he has sat with this for more than

7    17 months and essentially flagellated himself, come to

8    beg the mercy of his God to be able to make it through

9    to the next day.

10        THE COURT:  What is my duty in these circumstances

11   to the principle of general deterrence?

12        MS. GANT:  So I think because -- first I think

13   this is a particularly unique set of circumstances so I

14   don't think general deterrence should be weighed as

15   equally as the other factors.  So that's one issue.

16        The second is, if we look at, um -- it's hard at

17   this point, I think, to gauge these sentences that have

18   been or will be netted out in similar offenses that

19   occurred at that time because it was a very particular

20   moment in time, a very unique moment in time in the

21   aftermath of George Floyd's death, kind of akin, I

22   think, to, you know, the televised war of Vietnam when

23   it ultimately flooded people's living rooms and people

24   were greatly affected by that.  The same thing happened

25   with George Floyd when his death was witnessed over and

1    over and over on people's devices, computers, and TV

2    sets.  And because this was a particularly unique moment

3    in time, I don't think that general deterrence should be

4    afforded the same weight as a sentencing consideration.

5         Second, I think that, um, that some of the

6    examples that I have given at the end of the sentencing

7    memorandum reflect instances where the actions were

8    intended, premeditated, and designed to destabilize a

9    vulnerable city, these kinds of false-flag operations

10   that were deployed in Minneapolis.  Many of the

11   individuals who participated in protests, whether it be

12   in Portland Oregon, Minneapolis, or Boston, have not yet

13   been sentenced, so I don't have appropriate comps to be

14   able to afford the Court in its consideration in terms

15   of sentencing disparity.  But if we think about it in

16   terms of deterrence, 42 months for somebody who's never

17   been in jail is a very long time.  The government says

18   it's just not enough.  But that only considers the

19   circumstances of the offense, not the "why," not the

20   "how," not ultimately how do you prevent this from ever

21   happening again?

22        I think this Court can send a message to not only

23   the City of Boston, but to the black community in Boston

24   that a man like John Boampong is worthy of redemption --

25   certainly punishment, and he recognizes that he deserves

```
 1    that, but that he's worthy of redemption, and he's

 2    worthy of this Court's investment.  And I think by

 3    imposing a sentence of 42 months, which John will

 4    measure by the number of days that he's away from his

 5    son, by the number of dinners he will miss with his

 6    child, by the amount of time he will miss with his

 7    family, that that is a significant sentence that,

 8    despite the government saying it's not enough, is

 9    certainly very long.

10          I won't belabor the issues in the sentencing

11    memorandum but I do want to alert the Court that

12    Mr. Boampong does have supporters in the court today, he

13    has his sister, Nakia, his Godfather, Edward Gathers,

14    and his Godbrother, Jamal Gathers.  These are

15    individuals who have described how much of an aberration

16    his conduct was for Mr. Boampong and frankly how upset

17    they were.  There is accountability here both in the

18    small scheme and in the large scheme, and I think the

19    factors that the Court has to consider in my mind has to

20    begin and end with John Boampong.  Keeping the community

21    safe from a John Boampong that is stable, committed to

22    the ideals that his Godfather and his mother instilled

23    in him, I don't think the Court needs to be worried

24    about that John Boampong, and that's the John Boampong

25    who stands before you today.
```

```
1              I do know that he wants to address the Court.  And
2       I do want to just say that the 42 months that we
3       requested takes into account the fact that day for day
4       this sentence is going to be longer and harder for him.
5              In January 22, 2022, the Bureau of Prisons is set
6       to implement earned-time credits under the First Step
7       Act, which will make available evidence-based recidivism
8       reduction programming to a number of inmates as well as
9       a series of productive activities.  Those inmates who
10      are eligible to receive earned-time credits under the
11      BOP's -- under the First Step Act, are going to be
12      prioritized for the very programming that John Boampong
13      would benefit from.
14             So the sentence that he's going to be serving is
15      going to be functionally, visually, and day to day very
16      different, and frankly more difficult.
17             THE COURT:  You lost me there.  I understood you
18      to be saying that this was an advance in penology.
19             MS. GANT:  It is an advance for the BOP at large,
20      but his particular offense, specifically a 111(b)
21      offense, disqualifies him from earning time credits and
22      it disqualifies him ultimately from priority
23      consideration for the programming for which he would
24      benefit.
25             THE COURT:  Oh, I see, by the statute.
```

1          MS. GANT:  By the statute, by function of the

2     First Step Act and the BOP's deployment of that starting

3     in January.

4          THE COURT:  All right.  Thank you.

5          MS. GANT:  So the specific evidence -- I made a

6     list of programs in the, um, in the defendant's

7     sentencing memorandum that are specifically evidenced-

8     based recidivism reduction programs that were studied by

9     the BOP, signed off by partner agencies, and known to,

10    um, significantly reduce recidivism, and John Boampong

11    wants to participate in those kinds of programs and he

12    would benefit from participating in this program, he's

13    an industrious and incredibly diligent man.

14          For the last -- since he's been at Wyatt, I think

15    since September or October of last year, he's been

16    employed as a unit worker, it's something that he

17    dedicates himself to very seriously.  It's a modest job,

18    I mean I think it's maybe $1.35 a week or something like

19    that, but it is something that he takes seriously

20    because he sees himself as giving back to the unit where

21    he's living.  And so he may be able to, in those 42

22    months in the BOP, do some kind of work, but he's going

23    to be exempt from all of the various programs from which

24    he would benefit, including vocational programs like the

25    Federal Prison Industry's program, um, and like the

1   specific vocational training that's outlined in the

2   evidence-based recidivism reduction program that's

3   listed in the defendant's sentencing memorandum.

4       So the government says that 42 months is not

5   enough, but functionally it is more than enough to deter

6   John Boampong, to send a message to the community that

7   this conduct is serious, but that he is worthy of this

8   Court's investment and worthy of the opportunity to

9   redeem himself in the eyes of this Court, his family,

10  and frankly his country.

11      Now I'm going to defer to Mr. Boampong because I

12  do know he wishes to address the Court.

13      THE COURT:  Thank you.

14      Mr. Boampong, that is your right, you have the

15  right to speak to me directly.  Remember you don't have

16  to, but if you want to, I'll hear you now.

17      THE DEFENDANT:  Yes, I would like to.

18      THE COURT:  Proceed.

19      THE DEFENDANT:  Thank you for letting me express

20  myself, your Honor.  It's very important for me to speak

21  to you today to own my actions and to show you how far I

22  am from a violent person.

23      It's been 28 years of my life without a criminal

24  record.  After my first case with the police in 2010, I

25  was traumatized, I struggled with depression and

1   nightmares.  There were times that I thought my son

2   would be better off without me so I checked myself into

3   a mental health facility to seek help for all that I was

4   going through because I couldn't endure any more on my

5   own.  I also joined a group called "Fathers Uplift," at

6   the advice of my therapist, to engage in group therapy

7   along with my individual therapy.  I did that for many

8   years.

9         After my mom passed away in 2009 -- excuse me, in

10  2019, May, I took it very very hard, I did not or could

11  not understand that the one person who was so dear to me

12  could have died so suddenly or the way that she died,

13  due to medical neglect.  I visited her every day, I

14  washed her clothes, I tucked her into bed at times, and

15  I asked staff to check on her not knowing it would be

16  the last time that I would have any type of interaction

17  with my mother.

18        I later learned that a half an hour after I had

19  left her bedside, she had passed away.  I was so

20  heartbroken that I wanted to crawl up in a ball and die

21  myself, because I failed her.  The only thing that kept

22  me grounded was my son.  I cherish my son as he is one

23  of my greatest accomplishments in life.  I really

24  cherish him.  He is smart, he is kind, and I am a very

25  involved father in his life.

1    The other thing that gave me purpose after my mom
2    died was my job at Boston Sports Club as a customer
3    service manager, it gave me direction and a sense of
4    responsibility, as I've had many employees that reported
5    to me and asked me for advice on a lot of things.  I
6    also took a management course at Boston Sports Club to
7    try to become a more successful manager.
8        On June 1st, 2020, I made the worst decision of my
9    life, I could have hurt people or killed people.  I
10   carry that with me every day.  I have no one to blame
11   but myself.  I blame myself for not being true to
12   everything that my mother and my Godfather had instilled
13   in me.  I'm deeply sorry for everyone who has been
14   impacted and affected by my decisions and actions.
15       I lost my job that I could have turned further
16   advancement into a great career.  I let my son down.  I
17   let down my family, friends, as well as my community.  A
18   lot of people looked up to me for sound judgment,
19   advice, and how to maneuver through adversity in
20   troubled times.  I was a great role model for the
21   children in my life.  For those who say "It takes a
22   village to raise a child," I'm that villager, when
23   called upon, at all times, no matter what it calls for.
24   And I'm determined to live up to all of that again.
25       If I could have that night over again, I would

have been home with my son, my Godson, my little

cousins, we would have been barbecuing, running around

the yard, playing, being active, youthful, until I was

able to start my career at the Boston Sports Club as a

manager.

I miss being there for my son and all the children

in my life, I miss talking to them about what's going on

in their lives and helping them with any issues they may

have.  I miss my son a lot.  Since his birth we have

never been separated for an extended period of time and

it hurts me to have let him down.  It hurts me to hear

him say that he thinks I don't love him because I left

him all alone.  And I miss my Godson as well, he is only

4 years old and he's always asking when will he see me

again, not to mention the numerous amount of nieces and

nephews who I speak to on a frequent basis that ask the

same thing.

The impact of jail has been really hard for me too

and I want you to know that I understand the

consequences of my actions.  I hate jail with every

fiber of my being.  I feel ashamed to be here and to be

viewed as a low-life criminal.  It hurts my soul.  And

it's also been really scary during Covid as I have

contact with people who have Covid and have contracted

Covid myself.

1    I've watched people get really sick and be rushed

2    to the hospital from jail.  I've seen people harm

3    themself.  One inmate took a swan dive off his top bunk,

4    almost breaking his neck.  Another inmate hung himself.

5    I stood in disbelief as they're pulled into their cells

6    and medical staff tried everything they could to try to

7    bring them back.

8    This place is full of pain, despair, and death.  I

9    never want to do anything to put myself here again.  I

10   want to live up to the ideals that my mother and

11   Godfather instilled in me.  I want to continue to be a

12   great father to my son.  I'm asking for the opportunity

13   to redeem myself, my life, my character, and to honor my

14   family, my community, and this Court.

15   Thank you, your Honor, for allowing me to speak.

16   (Pause.)

17   THE COURT:  Mr. John Boampong, in consideration of

18   the offenses of which you stand convicted, the

19   principles of 18 United States Code, Section 3553(a),

20   the information from the United States Attorney, your

21   attorney, the probation officer, and yourself, this

22   Court sentences you to 5 years -- 60 months on each of

23   the counts of conviction, the sentence on each count to

24   run concurrent, one with the other.  Thereafter the

25   Court places you on 3 years of supervised release with

1   all the general and special conditions of supervised
2   release set forth in the presentence report.
3        The Court imposes no fine due to your inability to
4   pay a fine.  The Court imposes the $300 special
5   assessment as required by the law.
6        You shall have credit toward the service of that
7   sentence from the 1st of June, 2020 until today, because
8   you've been in custody for that time.  Let me explain
9   this sentence to you.
10        Mr. Boampong, I do see you, I see you, the person.
11   I try always to be candid when I sentence.  And in one
12   respect, despite the excellent argument made on your
13   behalf by your attorney, I disagree with her.  This is a
14   time where the principle of general deterrence weighs
15   very heavily in the balance.  Circumstances of that
16   night, the risk of breakdown of our legal framework, and
17   the violent actions that you took, possessing and firing
18   a firearm 11 times, transporting people who, I am left
19   to believe, if they were not themselves looting, were
20   the recipients of materials that had been looted,
21   requires a severe sentence.
22        Now having said that -- and I have no hesitancy in
23   saying it, none -- whether you believe me or not, I
24   believe everything you just said on your behalf.  I
25   believe you are a person of deep faith, of genuine

1   remorse.  I see many offenders who say "I'm sorry" after

2   it's over.  In your case, from the time you pled guilty,

3   I was convinced that you appreciated the severity of

4   your actions.  You did not try to excuse them.  You

5   accepted them.  You said, and I recall it vividly, that

6   you were setting an example for your son by your conduct

7   after you were arrested.  And so you have.

8        It is the strong recommendation of this Court, and

9   it will be in the judgment and commitment order, that

10  the rehabilitative services of the institution where you

11  serve your sentence be made available to you, because it

12  is this Court's view that you are a person who can take

13  best advantage of them.  I do recognize that.  But this

14  is a just and a fair sentence.  It is a sentence that

15  all of us as a society require.

16       You have the right to appeal from this sentence.

17  Should you appeal and should your appeal be successful

18  in whole or in part and the case remanded, you'll be

19  resentenced by another judge.  Ms. Gant, if an appeal is

20  decided upon, you want transcript, seek it from this

21  session of the court because I'll turn it around right

22  away.

23       Do you understand?

24       MS. GANT:  Of course, your Honor.  Thank you.

25       THE COURT:  That's the sentence of the Court, he's

1  remanded to the custody of the marshals.

2       PROBATION OFFICER:  Your Honor?

3       THE COURT:  Yes.

4       PROBATION OFFICER:  I may have missed it, but I

5  would recommend, um, for supervised release that all of

6  the standard conditions be imposed and that the special

7  condition be imposed that he participate in mental

8  health treatment and take his medications as directed

9  and contribute according to his ability to do so.

10      THE COURT:  It is so ordered in precisely the

11 language that you suggested.  And if I overlooked it, I

12 apologize.

13      PROBATION OFFICER:  Thank you, your Honor.

14      THE COURT:  And I should say something further,

15 picking up on Ms. Gant's very, um, thorough argument.

16 It does seem to me that when he goes on supervised

17 release, he ought be considered for our Restorative

18 Justice Program.

19      PROBATION OFFICER:  I will list that as a judicial

20 obligation.

21      THE COURT:  Yes.

22      Ms. Gant?

23      MS. GANT:  Thank you, your Honor.  I neglected to

24 ask, um, consistent with the First Step Act's

25 considerations of proximity to a home in terms of BOP

```
1   placement, that the Court recommend, commensurate with

2   Mr. Boampong's security level, that he be placed in a

3   facility close to home.

4         THE COURT:  I will so recommend and the judgment

5   will reflect it.

6         MS. GANT:  Thank you, your Honor.

7         THE COURT:  That's the sentence of the Court.

8         MR. DAWLEY:  Your Honor, I apologize, I have one

9   more point.  I might have missed it as well.  But I

10  would just point out, um, for the Court and for the

11  defendant, that there was a notification already that

12  there is a forfeiture of the firearm --

13        THE COURT:  The forfeiture is allowed as to the

14  firearm.

15        MR. DAWLEY:  Thank you, your Honor.

16        THE COURT:  Thank you both.  We'll recess.

17        (Ends, 1:00 p.m.)

18

19

20

21

22

23

24

25
```

1              C E R T I F I C A T E

2

3

4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5   do hereby certify that the foregoing record is a true

6   and accurate transcription of my stenographic notes,

7   before Judge William G. Young, on Tuesday, October 26,

8   2021, to the best of my skill and ability.

9

10

11

12   /s/ Richard H. Romanow 11/01/21
     _____
13   RICHARD H. ROMANOW  Date

14

15

16

17

18

19

20

21

22

23

24

25